THE STATE OF WASHINGTON, *Respondent*, v. OLGA RITA GAY,
*Appellant*.

*Nels B. Nelson, Jr.* (of *Nelson, Hanson & Lozier*), for appellant.

*Ronald L. Hendry, Prosecuting Attorney, Joseph D. Mladinov, Special Counsel,* and *Eugene G. Olson, Chief Criminal Deputy,* for respondent.

ARMSTRONG, J.—Defendant, Olga Rita Gay was convicted of attempted murder in the first degree for hiring a man to kill her husband and assisting him by furnishing pictures for identification and advising him where her husband could be found. The man she hired was in fact a police detective, who had no intention of killing her husband. Pursuant to RCW 9.01.070(1), the attempt statute, she was sentenced to imprisonment for not more than 20 years.

Defendant's six assignments of error essentially raise three major issues. (1) Do the facts charged in the information constitute the crime of attempted murder in the first degree? We hold that they do. (2) Did the trial court err in refusing to give the defendant's proposed instruction on "attempt," which distinguished between mere preparation and an attempt? We find no error under the uncontroverted facts of this case. (3) Did the trial court err in allowing the state's psychiatrist to give his opinion as to the defendant's sanity at the time of the alleged crime when a prior court order had sought to limit the psychiatrist's report and subsequent testimony to the defendant's mental

competency to stand trial? We find no error under all of the circumstances of this case.

Except for the mental condition of the defendant, the essential facts are virtually undisputed. Harold T. White, a detective with the Tacoma Police Department, was told on September 23, 1969, that the defendant was looking for someone to kill her husband. This information, together with a phone number where Mrs. Gay could be reached, was given to Detective White by an anonymous third person.

Detective White made a telephone call to the defendant on September 24, 1969. During the first conversation, the detective stated that he "understood she was trying to hire somebody to do a special job" and asked her how much she would pay. As the conversation continued it became evident that the "special job" Mrs. Gay wanted performed was to have her husband killed. A price of $10,000 was suggested by Mrs. Gay. It was agreed that the feigned assassin was to receive $1,000 in cash and a note with property as collateral for the remaining $9,000. Detective White told Mrs. Gay he was an army sergeant back from Viet Nam en route to Georgia and he would be available for the "special job."

Arrangements were made for the feigned assassin to call the next day at another telephone. He was to let the phone ring twice, hang up and then call again, as Mrs. Gay was having trouble with bill collectors and did not want to talk to anyone but him.

The detective called the next day as instructed. The defendant expressed difficulty with raising the $1,000 cash, but stated that the remaining $9,000 would be paid out of the proceeds of her husband's $50,000 life insurance policy of which she was the beneficiary. Mrs. Gay also agreed to supply pictures of her husband and information about his habits and where he lived.

During the initial conversation, the detective had asked Mrs. Gay about obtaining a gun from her. She had replied that she might have an old one. However, during the sec-

ond conversation she said that the old one she had in the basement did not work. Arrangements were then made for the detective to call back in about a week, at which time the defendant was to have the $1,000 in cash. The detective did call back on October 1, 1969, at which time Mrs. Gay stated that she had the $1,000 in cash and a note for the $9,000. She then suggested that the two meet on the next morning, October 2, 1969, at the K-Mart parking lot at 6th Avenue and Orchard, in the city of Tacoma.

The meeting and exchange of money, pictures and information about her husband's habits took place on October 2, 1969, as scheduled. Tacoma police officers were hidden nearby in a camper truck equipped with a video tape camera. Detective White had a sound transmitter on his person which relayed their conversation back to the camper. This resulted in the police obtaining an audio-video tape of most of the discussion between Mrs. Gay and the detective. This court, as well as the trial court and the jury, had an opportunity to see and hear that final discussion of the arrangements. During the last discussion it was agreed that if Mr. Gay did not die, the defendant would not have to pay the $9,000.

Shortly thereafter Mrs. Gay was arrested and charged with attempted murder in the first degree. The information charging the defendant reads as follows:

That the said OLGA [RITA] GAY in the County of Pierce, in the State of Washington, on or about the 2nd day of October, 1969, did then and there being unlawfully, wilfully, and feloniously, with a premeditated design to effect the death of another person, to-wit: Wilson Gay, did attempt to kill and murder the said Wilson Gay in that she did counsel, encourage, hire, induce, or otherwise procure another person to commit and effect the murder of Wilson Gay.

At the trial testimony was introduced which showed that the defendant had been married four times prior to her marriage to Wilson R. Gay, Jr., the intended victim. Divorce proceedings were commenced in December of 1968, at

which time the parties separated, Mr. Gay moving into a separate apartment.

Mrs. Gay had been teaching school at the elementary level between 1954 and 1967. She was considered to be an excellent teacher by her colleagues. She quit teaching in 1967 and devoted her time to managing the family's extensive rental property.

Mr. Gay testified that someone had forged his name on various instruments relating to his life insurance policy. On January 3, 1969, someone had signed his name on a "Statement of Good Health and Insurability." On March 13, 1969 an "Absolute Assignment" of the policy to Mrs. Gay was submitted to the insurance company containing the purported signature of Mr. Gay. The policy had been taken out by Mr. Gay in October of 1968, but Mr. Gay stated that he had never made any payments on the policy and had no idea of the status of the policy after January, 1969. Four premium payments on the policy were paid by checks written by Mrs. Gay.

We shall first consider whether the acts alleged in the information constitute the crime of attempt to commit murder in the first degree. Defendant presents a twofold argument: (1) our state does not have such a crime as attempted murder in the first degree, and (2) assuming for the purpose of argument that we do recognize such a crime, the hiring of another to commit the crime would be no more than solicitation and would not constitute an attempt to commit the crime of murder.

Although we have no case in point in our jurisdiction, an analysis of our state statutes relating to murder and attempt to commit a crime will demonstrate that our laws do provide for the crime of attempted murder in the first degree.

Murder in the first degree is defined, in the relevant portion of our statute, as the killing of a human being when committed with a premeditated design to effect the death of the person killed. RCW 9.48.030. Our attempt statute, RCW 9.01.070, provides in part:

An act done with intent to commit a crime, and tending but failing to accomplish it, is an attempt to commit that crime; and every person who attempts to commit a crime, unless otherwise prescribed by statute, shall be punished as follows:

(1) If the crime attempted is punishable by death or life imprisonment, the person convicted of the attempt shall be punished by imprisonment in the state penitentiary for not more than twenty years.

It will be observed that the punishment of an attempt to commit a crime "punishable by death or life imprisonment" is prescribed by statute. A statute which defines the punishment for attempts to commit a crime punishable by death or life imprisonment contemplates the crime of attempt to commit murder. 1 O. Warren and B. Bilas, Warren on Homicides § 81 (1938).

This position finds further support in *United States ex rel. Di Stefano v. Moore,* 46 F.2d 308, 309 (E.D. N.Y. 1930). That case interpreted attempt and penalty statutes of the state of New York very similar to our statute. The court ruled, "These sections are sufficiently broad to include an attempt to commit murder." *See People v. Fuller,* 281 App. Div. 1004, 120 N.Y.S.2d 610 (1953).

We find that there is no merit to the contention that the law of our state does not provide for the crime of attempted murder in the first degree.

We are, however, still faced with the argument that hiring another person to commit the crime would merely constitute solicitation and therefore the information does not state the crime of attempted murder in the first degree. We cannot agree. The information charged that the defendant "did attempt to kill and murder the said Wilson Gay in that she did counsel, encourage, hire, induce, or otherwise procure another person to commit or effect the death of Wilson Gay."

We agree that solicitation alone would not constitute the crime of attempt. Solicitation is a step in the direction of the target crime but it does not constitute the overt act directed toward its commission that is a necessary

element of the crime of attempt. Solicitation involves no more than asking or enticing someone to commit a crime. *See* R. Anderson, 1 Wharton's Criminal Law and Procedure § 81 (1957); and *see* Clark and Marshall, A Treatise on the Law of Crimes § 4.05 (7th ed. 1967). An information which charges the defendant with hiring someone to commit a crime alleges the consummation of the contract. Such a hiring is an overt act directed toward the commission of the target crime. It goes beyond the sphere of mere solicitation and it may constitute the crime of attempt. *See State v. Mandel*, 78 Ariz. 226, 278 P.2d 413 (1955). Whether a particular overt act does constitute the crime of attempt will depend upon the facts and circumstances of each case. *State v. Lewis*, 69 Wn.2d 120, 417 P.2d 618 (1966).

We conclude that the court did not err in denying the motion to quash the information because the information contains the essential elements of the crime of attempted murder in the first degree.

Turning now to the second major issue, relating to whether the court erred in refusing to give the defendant's proposed instruction on "attempt," which distinguished between mere preparation and an attempt, we find that we must analyze the evidence and the law to determine whether "mere preparation" was an issue in this case. In other words, had the overt acts of the defendant gone so far in laying the foundation for the murder that there was nothing else she could do to perform her part of the crime? Had her acts, by uncontroverted testimony, clearly put the defendant beyond the sphere of mere preparation?

■ The general rule is that mere preparation is not sufficient to sustain a conviction for an attempt to commit a crime. *State v. Goddard*, 74 Wn.2d 848, 447 P.2d 180 (1968); R. Anderson, 1 Wharton's Criminal Law and Procedure § 75 (1957). We find, however, that the acts committed by the defendant go beyond either solicitation or mere preparation.

To sustain a conviction for an attempt to commit a crime the state must prove two coinciding elements: (1) that the

defendant actually intended to commit the target crime and (2) that he performed an *overt* act directed toward its commission. The overt act must reach far enough toward the accomplishment of the target crime to amount to the commencement of the consummation. The overt act, however, need not be the last possible act to the consummation of the target crime. *State v. Goddard, supra; State v. Lewis, supra.*

The fundamental reason back of the requirement of an overt act is that until such act occurs there is too much uncertainty that a criminal design is to be apparently carried out. When the conduct of the defendant becomes unequivocal and it appears that the design will be carried into effect if not interrupted, we have a condition that meets the test of overt acts intended to accomplish the target crime. *People v. Miller,* 2 Cal. 2d 527, 42 P.2d 308, 98 A.L.R. 913 (1935); *State v. Mandel, supra.* When the intent to commit the target crime is clearly shown, slight acts in furtherance thereof will constitute an attempt. *State v. Goddard, supra.*

We shall now analyze the evidence to ascertain whether the defendant intended to commit the crime of murder and whether she committed an overt act or acts toward the commission of the crime, which in the ordinary and likely course of events, would have resulted in the murder of her husband.

Intent to murder her husband was clearly established by the following undisputed evidence: (1) the forged assignment of the insurance policy 6 months before she hired a man to kill her husband, (2) the payment of premiums on her husband's $50,000 life insurance policy after the divorce was commenced, without the knowledge of her husband, and (3) the hiring of the feigned assassin. Since the intent was so clearly established, slight overt acts in furtherance of that intent would establish the crime of attempt to commit murder in the first degree.

Instead of slight acts, however, we find undisputed testimony, corroborated by the audio-video tape, that she paid the feigned assassin $1,000 as a retaining fee and agreed to

pay him the additional $9,000 when her husband had died. She furnished him pictures of her husband so he would kill the right man and told him about her husband's habits and where he might be found. We find by uncontradicted and corroborated evidence that she had done everything that was to be done by her to accomplish the murder of her husband. Since the feigned assassin had made all the contacts and she had no way to contact him, she could not have stopped him after the final planning at the K-Mart parking lot. The situation was then beyond her control. At this point there was no longer an issue of whether the acts constituted mere preparation rather than attempt to commit murder. The defendant's acts had placed her beyond the stage of preparation. It was, therefore, not error for the court to define the test for the jury in terms of attempt and to refuse to give the instruction which differentiated between attempt and mere preparation. Absent such a conclusive showing as we find in this case, a trial court should define preparation and differentiate between mere preparation and the overt acts required to prove an attempt to commit a crime.

 The fact that the hired assassin was feigned does not relieve the defendant. It is not necessary that the contemplated murder be factually possible. It is sufficient if it was apparently possible to the defendant. *State v. Mandel, supra.* See RCW 9.01.030.[1]

The *Mandel* case had facts similar to the case at bar. The italicized portions of the statement of the Arizona Supreme Court at page 229 are equally applicable to this case. We concur in the following analysis:

> *We think the circumstances in this case put the defendant beyond the sphere of mere solicitation or preparation. She not only solicited, she consummated the contract to that end and partly executed the same by pay-*

---

[1] RCW 9.01.030 provides in part: "The fact that the person aided, abetted, counseled, encouraged, hired, commanded, induced or procured, could not or did not entertain a criminal intent, shall not be a defense to any person aiding, abetting, counseling, encouraging, hiring, commanding, inducing or procuring him."

*ment of a portion of the consideration;* she identified for the intended assassin the home and the car of the intended victim, pointed out a possible site for disposition of the body and advised the place and time when and where contact could be made for the consummation of the murder. *She did everything she was supposed to do to accomplish the purpose. Had it not been for the subterfuge, the intended victim would have been murdered. Under such circumstances she cannot escape by reason of clever, elusive distinctions between preparation, solicitation and acts committed in furtherance of the design.*

(Italics ours.)

 The defendant next contends that the court erred in its instruction as to the defense of entrapment, which reads as follows:

You are instructed that a criminal defendant invoking the defense of entrapment must show that the criminal design originated in the mind of the police officer and not with the accused, *and* that the accused was lured or induced to commit a crime he had not intended to commit. If the crime originated in the mind of the accused, an officer may afford the accused an opportunity to commit the crime, and, when acting in good faith, make use of deception.

(Italics ours.)

The defendant argues that the instruction should have read "or", not "and." However, the instruction sets forth a proper statement of the law of entrapment. *Seattle v. Muldrew,* 71 Wn.2d 903, 431 P.2d 589 (1967).

In the third major issue, the defendant contends that the trial court erred in allowing the state's psychiatrist to testify beyond the confines of a prior court order limiting the psychiatric report and subsequent testimony to the defendant's mental competency to stand trial. At trial the state's psychiatrist, after detailing the nature of his examination, but omitting any reference to her statements relating to the crime, gave his opinion that the defendant was able to distinguish right from wrong on October 2, 1969 (the date of the crime). The defendant argues that she had been compelled to incriminate herself by testimonial compulsion

in violation of the fifth amendment to the United States Constitution and that she was denied due process of law in violation of article 1, section 3 of the Washington State Constitution. Under the facts of this case, we cannot agree.

A chronology of events is important in understanding the action of the trial court. On October 3, 1969, the information was filed charging the defendant with attempted murder in the first degree. At the arraignment on October 6, 1969, the defendant pleaded not guilty and the trial was set for December 8, 1969.

At the request of the defendant's attorney, a psychiatric examination of the defendant was made by Dr. Nicholas Godfroy on the day of her arrest on October 3, 1969. At the psychiatrist's recommendation, the defendant became an in-patient at the psychiatric department of St. Joseph's Hospital from October 13 to October 21, 1969. There Dr. Godfroy treated her on a daily basis. When she was released from the hospital it was Dr. Godfroy's opinion that she was capable of managing her own affairs and could assist in her own defense. Dr. Godfroy had about 15 consultations with the defendant before her trial.

On October 20, 1969, on motion by the state, the trial court signed an order permitting an examination of the defendant by Dr. Myron Kass, a psychiatrist, to determine her competency to stand trial. No defense of insanity had been raised and the court order stated that

Said report or subsequent testimony is limited to only the purposes stated herein. It is further provided, however, that no statements pertaining to the crime with which she is charged, Attempted Murder in the First Degree, obtained from the defendant during this period of evaluation may be used against her in the trial of this matter.

The psychiatric examination by Dr. Kass was performed on October 24, 1969, and his report was filed with the court on November 17, 1969. Pursuant to a hearing on December 4, 1969, the defendant was found mentally competent to stand trial. Both psychiatrists agreed with this finding.

On December 5, 1969, the defendant entered a spe-

cial plea of not guilty by reason of insanity. As the trial court pointed out, RCW 10.76.020, relating to a plea of not guilty by reason of insanity, clearly requires that such a plea be entered as soon as the alleged insanity is known to any person authorized to enter the plea.[2]

At trial, Dr. Godfroy, the psychiatrist for the defendant, expressed his opinion that the defendant had a "psychotic break" and had functioned as an insane person for at least a couple weeks prior to the time he first examined her on the day of her arrest. It was his opinion that she was psychotic, did not know right from wrong and could not comprehend the nature of her acts at the time of his first examination immediately after her arrest.

During rebuttal the state sought to call Dr. Kass to give his opinion as to the sanity of the defendant at the time of the crime. The defendant objected for two reasons: (1) because the order authorizing the psychiatric evaluation for the state had limited the report and subsequent testimony to determining whether she was mentally competent to stand trial, and (2) because she had consented to answer questions and cooperate with the psychiatric examination only for the limited purpose of that determination, and to permit the psychiatrist to testify as to her sanity at the time of the crime would infringe upon her constitutional right not to incriminate herself. Defendant's counsel told the trial court that if he had known the examination of the

---

[2]RCW 10.76.020 provides: "When it is desired to interpose the defense of insanity or mental irresponsibility on behalf of one charged with a crime, the defendant, his counsel or other person authorized by law to appear and act for him, shall at the time of pleading to the information or indictment file a plea in writing in addition to the plea or pleas required or permitted by other laws than this, setting up (1) his insanity or mental irresponsibility at the time of the commission of the crime charged, and (2) whether the insanity or mental irresponsibility still exists, or (3) whether the defendant has become sane or mentally responsible between the time of the commission of the crime and the time of the trial. The plea may be interposed at any time thereafter, before the submission of the cause to the jury, if it be proven that the insanity or mental irresponsibility of the defendant at the time of the crime was not before known to any person authorized to interpose a plea.".

state's psychiatrist was to be conducted for the purpose of determining the defendant's mental state at the time the crime was committed he would have instructed his client to remain silent.

The court ruled that the state's psychiatrist should be allowed to testify as to the defendant's mental state at the time of the examination and at the time of the crime, but that he would be prohibited from testifying directly to any incriminating statements she might have made to the doctor.

Dr. Kass then testified as to the emotional problems observed in his psychiatric examination of October 24, 1969. He expressed his opinion that, "Emotionally she is skating on thin ice, but I could not see any evidence of psychosis or insanity." When asked about what her mental condition would have been on October 2, 1969, he replied:

Well, my opinion I think her mental status would have been relatively the same in the three-week prior time. The reason I say this is because there are very few mental illnesses that would clear up within a three week period of time. Generally speaking, if a person is psychotic or insane they will show symptoms of this three to four weeks later despite our modern treatments. [Exceptions not applicable to this case described.] So generally speaking, with this particular person in this case, if she would have in my opinion, been insane three or four or five or six weeks prior, I would have seen symptoms of same and I did not.

Dr. Kass then expressed his opinion that the defendant would be able to distinguish right from wrong on October 2, 1969 (the date of the crime). The psychiatrist made no reference to any self-incriminating statements made by the defendant.

In resolving the legal problems presented in this issue we are *almost* brought to grips with serious questions facing our criminal courts today: (1) does the superior court have inherent power to order a *cooperative* psychiatric examination on behalf of the state when a defendant enters a plea of not guilty by reason of insanity, and, (2) if the defend-

ant does not choose to cooperate with the psychiatric examination, what should the court do to assure a fair trial to the state as well as to the defendant? Our Supreme Court has made no resolution of these questions, but by way of dictum in *State v. Reed,* 71 Wn.2d 550, 429 P.2d 870 (1967) stated: "where a plea of mental irresponsibility is entered or where it is asserted by the defendant that he is incompetent to stand trial, the court has the inherent power to order the defendant examined by psychiatrists." Our jurisdiction has not had the occasion to determine whether the defendant must cooperate with the examination and if he does not, what sanctions may be imposed. We are left with the conflict between the constitutional right of the accused not to incriminate himself and the right of the state to meet this defense and the testimony of the defendant's psychiatrist with the testimony of a psychiatrist which is based upon a meaningful and timely psychiatric evaluation. Although we do not meet that issue in this case, we have footnoted some of the authorities that have considered the questions we have raised.[3]

We need not answer the perplexing problems raised by the conflicting interests of the defendant's right not to incriminate himself and the right of the state to meaningfully meet the defense of insanity because of the facts of this case. The defendant did not enter a plea of not guilty by reason of insanity in a timely manner as required by RCW 10.76.020. A psychiatric evaluation by the defendant's psychiatrist was made on October 3, 1969. After that evaluation the defendant and her counsel should have been aware of whether such a plea would be entered and an appropriate written plea should have been entered at the time of the plea of not guilty on October 6, 1969.

---

[3]For authorities which have considered the conflicting interests of the defendant's right not to incriminate himself and the right of the state to meet the defense of insanity, *see State v. Whitlow,* 45 N.J. 3, 210 A.2d 763 (1965); *Lee v. County Court,* 27 N.Y.2d 432, 267 N.E.2d 452, 318 N.Y.S.2d 705 (1971); J. Marcus, *Pre-Trial Psychiatric Examination: A Conflict With The Privilege Against Self-Incrimination,* 20 Syracuse L. Rev. 738 (1969).

■ At the time the order limiting the use of the psychiatric examination on behalf of the state was entered on October 21, 1969, there was no plea of mental irresponsibility. No such plea was entered until 2 months after the plea of not guilty. The testimony of the psychiatrists for the state and for the defendant both emphasized the time element in making a meaningful psychiatric evaluation. The state psychiatrist indicated that symptoms of insanity would persist for from 3 to 6 weeks if the defendant was insane at the time of the crime, even though she had been treated.

If the defendant enters a plea of not guilty by reason of insanity, and calls a psychiatrist to testify in support of that plea, the state is entitled to meet that testimony by the testimony of its own psychiatrist. The statute provides, and fairness requires, that the state be advised of the plea of mental irresponsibility when the mental condition of the defendant becomes "known to any person authorized to interpose such a plea." See RCW 10.76.020. It is necessary that the state be advised in a timely manner so that the state may obtain a meaningful and timely psychiatric evaluation to meet the testimony the defendant presents in support of the plea of mental irresponsibility. *See State v. Whitlow,* 45 N.J. 3, 210 A.2d 763 (1965). Entering a plea of not guilty by reason of insanity 2 months after the defendant had an opportunity to know that such a plea may be entered, without advising the state, would deprive the state of an opportunity to secure another psychiatrist who would be in an advantageous position to meet the timely psychiatric evaluation testimony that was available to the defendant. Under such circumstances the court was authorized to utilize the testimony of the psychiatrist who had examined the defendant 3 weeks after her arrest even though that examination, by court order, was limited to an evaluation to determine whether defendant was competent to stand trial. It would be a travesty of justice to permit a defendant to invoke the defense of insanity, support it with the testimony of a psychiatrist who examined the defendant a day

after the crime and then foreclose the state from the benefit of a *timely* mental examination to meet this issue. A defendant ought not be able to unreasonably delay a claim of insanity and then make the rules for a determination of the claim by refusing to cooperate with the delayed psychiatric evaluation on behalf of the state. As Justice Cardozo stated in *Snyder v. Massachusetts,* 291 U.S. 97, 122, 78 L. Ed. 674, 54 S. Ct. 330, 90 A.L.R. 575 (1934):

> But justice, though due to the accused, is due to the accuser also. The concept of fairness must not be strained till it is narrowed to a filament. We are to keep the balance true.

We are not faced with the self-incrimination problem of the state's psychiatrist testifying to statements of the defendant about the crime. The psychiatrist complied with the court order prohibiting any incriminating statements that the defendant may have made to him. We find no prejudice to the defendant in the manner in which the trial court resolved the perplexing problems posed by the defendant's failure to enter the insanity plea in a timely manner.

The judgment is affirmed.

PETRIE, C.J., and PEARSON, J., concur.
Petition for rehearing denied June 3, 1971.
Review denied by Supreme Court July 1, 1971.