## 76888. SMITH v. THE STATE.
### (375 SE2d 69)

BEASLEY, Judge.

Smith appeals his conviction and sentence for criminal attempt (OCGA § 16-4-1) to commit murder (OCGA § 16-5-1).

The evidence construed so as to uphold the verdict showed the following: The office of the Magistrate Court of Lowndes County was under investigation by the GBI at the time Smith was chief magistrate. Smith got tired of the investigation, he could not function, he was depressed, and he resigned although it "broke [his] heart" to do so. He told an employee of the Magistrate Court that he blamed Sheriff Carter for initiating the investigation and that he would get even with him.

As early as 1982 (the incident on trial took place in 1987), Smith spoke of his intention to replace Carter as sheriff. He told one man he was going to get Carter out of the office "one way or the other." He told another he had had a "run-in" with Carter. Soon after Smith resigned as magistrate, he related to a third person that he had been "railroaded" and "harassed" by the officials and he felt that Carter had been the instigator.

In an unrelated investigation, federal agents interviewed a man named Hall. Hall told FBI agent Sparks that three or four months earlier, Smith had talked to Hall about finding someone to kill Sheriff Carter. Sparks reported this to Bennett, Chief of Detectives for the Valdosta Police Department. After some time had elapsed and at Sparks' urging, Bennett gave Hall a tape and recorder and asked him to record a conversation with Smith.

Hall taped a lengthy conversation with Smith in which Smith stated he wanted to be the sheriff: (Smith): "An election now and I don't believe Paulk will run now." (Hall): "You're talking like if the Sheriff disappears?" (Smith): "If he just doesn't come to work one day and he's not around town anymore." Later in the conversation, Hall told Smith that he "talked to [his] friend and it's gonna cost $25,000. . . ." and implied that he Hall would take care of the monetary cost if Smith would do him favors when Smith became sheriff. Smith agreed, detailed some of the possible favors, and spoke of his desire for revenge. He cautioned that "everything we do we've got to carefully plan it and carefully do it. I intend to (unintelligible). I don't intend to leave them a trail."

Smith stated it was going to be easy, that one could walk up to the sheriff when he goes to get in his car, get in the car with him and

pull the radio unit out. Smith cautioned that he did not want the automobile "messed up"; it was brand new so it should not get any stains on it. When Hall inquired what Smith thought was the "best way to do it" Smith responded, "I would — I, I don't know their business. They know, they know ways to do it. I don't know their business. High powered or maybe close range. I don't know what they use." Smith concluded that the easiest and quickest way was to use a double barrel shotgun. Smith did not know where the sheriff lived but said he would find out. In a later taped conversation, Hall told Smith that Hall's "friend" was coming to town and that they needed a map. Smith said he would get to work on it.

Following receipt of the initial tape, Chief Detective Bennett met with GBI agent Lang, who agreed to pose as the hitman promised by Hall. Lang met with Smith and Hall and recorded the conversation. Lang asked Smith if he wanted him to kill the sheriff. Smith replied, "You g___ d___ right. I want him gone."

There followed other explicit discussions between Smith and Lang about Lang's being in town for the purpose of killing the sheriff for money. When asked if he would provide a gun, Smith stated that it would be foolish to go buy one because that would leave a trail. Hall pointed out that Lang was wearing a gun but Lang voiced reluctance to use his own weapon. Smith and Lang debated the merits of different types of guns.

When asked for directions to the sheriff's home, Smith replied that he would draw a map, that he had a county road map, and that he would describe the house so a blind man could find it. There was further discussion about money and future favors; Smith agreed to provide $500 to Lang and stated that he (Smith) needed to find out where the sheriff slept at night. A meeting was set for the next day.

In the morning, Smith met with Lang and Hall and gave Lang a detailed hand-drawn map to the sheriff's home. At a second meeting that day, Smith drove with Lang to show him the way to the sheriff's home. Smith described the sheriff's daily routine and his appearance. He pointed out his house, possible escape routes, the sheriff's automobile, and where the sheriff usually parked at the courthouse. Before they parted he agreed to verify the address. When Lang expressed some concern about getting paid, Smith assured him that he would because he might be needed again to kill another person, whom Smith identified.

The next day Lang met with Smith in the motel room. Smith said he was "ready" and everything was fine. He gave Lang $500 as the down payment for the killing and "the best we can do right now," not knowing that this $500 which Hall had provided to him had been borrowed from the Valdosta Police Department. Smith said he had verified the address and gave it to Lang in writing, and they discussed

the payment of the balance of the $25,000 fee, which was to be paid at "the end."

Lang said that he would come back up from Florida the following week and "take care of this," and Smith stated it would be best for himself to be in town when the killing occurred, so Lang was to call when he returned in order that Smith could make himself visible at places other than the homicide scene. Smith promised to "see what [he] could do" to get a shotgun because Lang was not sure he could get one. Smith told Lang how he could get a good look at the sheriff at the courthouse without arousing suspicion and went on to describe what he would do when he became sheriff.

The conversation ended with Lang stating that all he needed was the $500 to "get things rolling," and Smith assuring Lang that he and Hall would "work out the balance of it." Smith was arrested three days later.

The defense at trial was that Smith intended to run for sheriff and that he pretended to go along with Hall's plan to murder Sheriff Carter in order to expose Hall, have Hall arrested, and thus enhance his chances of becoming the next sheriff.

1. Appellant contends that the trial court erred in denying his motion for a directed verdict of acquittal and in entering a judgment of conviction and sentence because the evidence was insufficient. He maintains that (1) the furnishing of the map and $500 payment did not constitute substantial steps toward commission of murder; (2) the $500 payment was induced by police entrapment so that it could not be considered as evidence; (3) if the $500 payment could not be considered as a substantial step because of entrapment, merely providing a map was not a sufficient and substantial step.

"A person commits the offense of criminal attempt when, with intent to commit a specific crime, he performs any act which constitutes a substantial step toward the commission of that crime." OCGA § 16-4-1.

" ' "In order to constitute the offense of attempt to commit a crime, the accused must do some act towards its commission. Commission means the act of committing, doing, or performing; the act of perpetrating . . . Mere acts of preparation, not proximately leading to the consummation of the intended crime, will not suffice to establish an attempt to commit it." [Cit.] . . . " 'To constitute an attempt there must be an act done in pursuance of the intent, and more or less directly tending to the commission of the crime. In general, the act must be inexplicable as a lawful act, and must be more than mere preparation. Yet it cannot accurately be said that no preparations can amount to an attempt. It is a question of degree, and depends upon the circumstances of each case.' " [Cits.] . . . The "substantial step" language [of OCGA § 16-4-1] . . . "shifts the emphasis from what re-

mains to be done . . . to what the actor *has already done*. The fact that further steps must be taken before the crime can be completed does not preclude such a finding that the steps already undertaken are substantial . . . In addition to assuring firmness of (criminal) purpose, the requirement of a substantial step will remove very remote preparatory acts from the ambit of attempt liability and the relatively stringent sanctions imposed for attempts." ' [Cit.]" *Adams v. State,* 178 Ga. App. 261, 263 (2) (b) (342 SE2d 747) (1986).

(a) The map was an extraordinary one. It was a blueprint for the planned murder, complete with an arrow pointing to the victim's residence, his address and a description of the premises. It was the culmination of substantial effort on the part of Smith to learn of the victim's whereabouts. Smith cautioned the presumed hitman not to lose the document. The furnishing of the map was a significant and unequivocal act in the plan to have the sheriff killed.

(b) The payment of the money is not excluded as a product of entrapment. " 'Entrapment exists where the idea and the intention to commit the act originate with a police officer, who, by undue persuasion and deceitful means, induces the defendant to violate the law. But there is no entrapment where the officer merely furnishes an opportunity to a defendant who is ready to commit the offense. [Cit.]' [Cits.]" *Martin v. State,* 175 Ga. App. 704, 705 (2) (334 SE2d 32) (1985). The jury was charged on the defense of entrapment, which they chose to reject, and the evidence supports that determination.

Smith's relaying of the $500 to the supposed hitman with the agreement that it was to be the up-front money for the killing constituted another unequivocal act towards the killing. The agreement had been reached, and Smith himself was not to pay any of his own money but instead was to grant favors to Hall, the money provider, when he became sheriff after the competition was eliminated.

(c) Appellant ignores the numerous other acts which he engaged in which support the "substantial step" element of the offense and which are described in some detail above. The evidence supports the jury's conclusion that Smith's "conduct [went] beyond the sphere of mere solicitation or preparation" and "that the steps already undertaken [were] substantial." *Howell v. State,* 157 Ga. App. 451, 456 (4) (278 SE2d 43) (1981). The facts of this case are akin to those in *Howell,* and based on the law applied there, which also governs here, a holding that the evidence supports a finding of "substantial step" is inescapable. See also *State v. Gay,* 4 Wash. App. 834 (486 P2d 341) (1971) and *Braham v. State,* 571 P2d 631 (1971), similar cases which are cited in *Howell,* supra at 456, for the view adopted by this court in *Howell.*

Thus, denial of defendant's motion for directed verdict of acquittal and entry of judgment on the verdict was not error, as the evi-

dence was sufficient to enable any rational trier of fact to find that Smith was guilty of criminal attempt to commit murder beyond a reasonable doubt. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. Smith contends it was error to deny his motion to recuse the three judges of the Southern Judicial Circuit from presiding at the trial of his case because the victim of the charged attempt to commit murder was the sheriff (Smith was also indicted for soliciting another to procure someone to commit the murder, but was acquitted of the charge).

The motion was referred to the administrative judge of the judicial district, who was from another circuit. He certified the question to the Judicial Qualifications Commission pursuant to its Rule 22 but it declined to render an opinion on the subject. Opinion No. 104. On the basis of an evidentiary hearing and argument, the district administrative judge considered each one of defendant's contentions as to bias and denied the motion. The chief judge of the Southern Judicial Circuit then tried the case. Since the others were not involved in the trial, the issue as to them is moot.

Appellant's argument is based solely on Canon 3 C of the Georgia Code of Judicial Conduct, 251 Ga. 897, 900. Compare OCGA § 15-1-8. The canon is enforceable to govern the conduct of judges. *Judicial Qualifications Comm. v. Lowenstein*, 252 Ga. 432, 433 (1) (314 SE2d 107) (1984); *In the Matter of: Inquiry Concerning a Judge No. 591*, 250 Ga. 796, 797 (300 SE2d 807) (1983). See also *United States v. Cavataio*, 425 FSupp. 1250, 1254 (E.D. Mich. 1977); *Wallace v. Wallace*, 352 S2d 1376 (Ala. Civ. App. 1977).

The argument presented here is two-fold: (1) there was a special and close professional relationship in fact and in the minds of the public between the sheriff and the judges that per se constituted disqualification; (2) his treatment on matters of bond both before and after trial demonstrated lack of judicial impartiality.

(a) It is undisputed that there was a regular working relationship between the sheriff and court personnel including the superior court judges. But the existence of a working relationship in and of itself does not demonstrate or presume personal bias or prejudice on the part of the judges so as to run afoul of the Code of Judicial Conduct. See *Mann v. State*, 154 Ga. App. 677 (1) (269 SE2d 863) (1980). The nature of the judicial office is such that judges routinely and often daily interact with members of the local sheriff's department and other courthouse personnel involved in operating and providing support services to the court system. A judge is not prohibited from presiding over a criminal case in which the alleged victim is one with whom he has worked by either the canon or OCGA § 15-1-8.

Nor does appellant show how the sheriff's involvement as witness

or as observer at the trial along with his family affected the impartiality of the court in conducting the trial. The day-to-day professional relationship does not per se create a disqualifying cloud.

(b) Smith asserts that the case was "infected" with "political overtones" beginning with the language in the indictment that the victim was "G. Robert Carter, Sheriff of Lowndes County, Georgia." The judge, of course, has no control over the drafting of the indictment, so its wording does not reflect on the court's impartiality vel non.

Smith next raises as circumstances of political infection that he was arrested on a warrant issued by a certain judge who later held a hearing on bond and set its conditions. Smith's particular complaints in these regards need not be addressed because that judge did not preside at the trial.

Finally, the granting or denial of an appeal bond is in the discretion of the convicting court. OCGA § 17-6-1 (g). The judge who tried the case held a hearing and denied appeal bond after determining that there was substantial risk that the defendant would commit another felony offense and would pose a danger to persons in the community if released on bond pending appeal. Thus, the trial court answered two of the questions posed by Birge v. State, 238 Ga. 88 (230 SE2d 895) (1976) in the affirmative, and those findings are supported by the record and not clearly erroneous. Pressel v. State, 161 Ga. App. 488 (287 SE2d 780) (1982). No appeal was taken as to the bond. The handling of the appeal bond does not evidence any lack of impartiality by the trial judge.

Defendant has failed to show that the denial of the disqualification motion was error, and he does not point to anything in the trial of the case which might raise an inference of bias on the part of the trial judge.

3. Appellant also contends that the trial court violated OCGA § 17-8-57 in expressing an opinion as to what had been proven by the testimony of GBI agent Lang, who testified about his conversations with Smith.

On cross-examination, Lang was asked about Smith's refusals to Lang's requests for money. He was then asked whether or not he reported the refusals to Detective Bennett and said, "Try as I might I can't get him to give me any money." Lang stated that was exactly what happened and then attempted to explain Smith's thoughts at the time. Defense counsel objected that Lang could not testify as to what Smith was thinking and then the State objected that Lang was merely trying to explain his answer and that defense counsel was interrupting.

The court ruled that it would let Lang testify as to facts that he knew but not to facts that he merely speculated or conjectured about,

and it instructed Lang that he was permitted to explain his answer.

Lang testified that, ". . . Smith was going to get the money from David Hall and, and subsequently,—or have Hall, have Hall pay me the money. And if he could have gotten this thing done for nothing without him putting any money up, then he'd have been that much better off. He wouldn't have been out, out front with any money."

Defense counsel objected that, ". . . I'd like to instruct the witness that it is strictly speculating and argument and nothing—it hasn't anything to do with explaining his answer or any facts. And the Jury should be told to disregard it. He's just arguing the case."

The court responded, "I will not instruct the Jury to disregard it. The witness has again reiterated exactly what occurred, apparently, from the tapes that have been played." The defense made no further objection in this regard and cross-examination of Lang proceeded.

Appellant urges that the court's final comments not only allowed Lang to speculate as to his (Smith's) motives in refusing to pay the money, but also expressed an opinion that what Lang said was what had been proved.

" 'The statutory inhibition [OCGA § 17-8-57] against an expression or intimation of opinion by the trial court as to the facts of the case does not generally extend to colloquies between the judge and counsel regarding the admissibility of evidence. [Cits.]' [Cit.]" *Havard v. State*, 175 Ga. App. 798, 799 (334 SE2d 381) (1985).

Moreover, the defense made no objection following the court's comments. " '(T)he question of whether [OCGA § 17-8-57] has been violated is not reached unless an objection or motion for mistrial is made.' [Cit.]" *Smith v. State*, 158 Ga. App. 330, 331 (2) (280 SE2d 162) (1981). Appellant acknowledges this but complains that the court's instructions to "proceed" following its comments foreclosed the defense from further exception short of contempt of court. The court's simple and ordinary instruction to proceed does not constitute, perceptually or actually, an attempt to stymie further objection by the defendant.

In any event, the comments do not express an opinion as to what had been proved relative to the guilt of the accused but rather merely explained that the witness was repeating what had already been heard.

*Judgment affirmed. Birdsong, C. J., and Banke, P. J., concur.*

DECIDED OCTOBER 4, 1988 —
REHEARING DENIED OCTOBER 26, 1988 —

*J. Converse Bright*, for appellant.

*H. Lamar Cole, District Attorney*, for appellee.