195 P.3d 512 (2008)
STATE of Washington, Respondent,
v.
William F. JENSEN, Petitioner.
No. 79384-1.
Supreme Court of Washington, En Banc.
Argued May 22, 2008.
Decided November 6, 2008.
*514 Jeffrey Erwin Ellis, Ellis Holmes & Witchley PLLC, Seattle, WA, for Petitioner.
Julie Anne Kays, Prosecuting Atty. King County, James Morrissey Whisman, King *515 County Prosecutor's Office, Seattle, WA, for Respondent.
MADSEN, J.
¶ 1 This case concerns the unit of prosecution for solicitation to commit murder. While in jail for threatening his wife, William Jensen solicited a fellow inmate to murder four members of his family. He repeated the solicitation to the inmate's purported crime partner and offered an additional sum of money to kill the youngest victim. A jury convicted Jensen of four counts of solicitation of first degree murder, one for each target victim. Jensen contends three of the convictions must be vacated under this court's recent decision. State v. Varnell, 162 Wash.2d 165, 170 P.3d 24 (2007).
¶ 2 We reaffirm our holding in Varnell that the unit of prosecution for solicitation to commit murder centers on the enticement, not the number of victims. As applied to the facts of this case, Jensen is criminally liable for two solicitations. We reverse, in part, and remand for vacation of two convictions and resentencing.

FACTS
¶ 3 Jensen was jailed for threatening to kill his wife during an acrimonious dissolution proceeding. After overhearing his bitter complaints, fellow inmate Gregory Carpenter approached Jensen and suggested he may be able to "solve [his] problems." Verbatim Report of Proceedings (VRP) (May 24, 2004) at 150. They discussed various proposals over the next few days. Jensen indicated he wanted his wife dead. He believed if she died before their dissolution became final, he would inherit her sizeable estate. Carpenter pointed out the estate would probably go to Jensen's sister-in-law and children.
¶ 4 After taking some time to "mull" things over, Jensen offered Carpenter $100,000 to kill his wife, sister-in-law, daughter, and son, with a $50,000 bonus if he "did it right." State Ex. 23, at 28. Carpenter agreed to kill the three women but declined to kill Jensen's son, stating he "doesn't do minors." Id. at 25.
¶ 5 Jensen arranged for Carpenter to receive $2,500 of front money. VRP (May 24, 2004) at 158, 163-64. Carpenter collected the money a few hours after he was released from jail. He spent the money on drugs and alcohol, which landed him back in jail shortly thereafter. While in jail, Carpenter contacted the police. A detective asked Carpenter to call Jensen and tell him his sister "Lisa" would visit him at the jail to confirm the details of their plan.
¶ 6 Posing as "Lisa," an undercover police detective visited Jensen. VRP (May 26, 2004) at 73-74. She showed him a letter, written by Carpenter, memorializing their agreement. Jensen asked her to have Carpenter go ahead with the plan. He promised to supply additional front money as soon as possible. Id. at 89-90.
¶ 7 A few days later, "Lisa" visited Jensen again, this time wearing a body wire. Jensen confirmed the details of the plan. Id. at 98-99; State Ex. 23. He stressed the murders should take place the following Monday morning because his sister-in-law, daughter, and wife would be together at the house before leaving for a pretrial hearing in his case. Lisa explained she and a "buddy" would commit the killings because Carpenter would not be out of jail by then. Id. at 119.
¶ 8 Jensen complained Carpenter was unwilling to kill his son. He offered "Lisa" an extra $50,000 to have his son killed. Lisa assured him her "buddy" had no scruples about killing a child. Jensen's final words before parting were "Okay. Make it look like an accident." State Ex. 23, at 33.
¶ 9 The State charged Jensen with four counts of solicitation to commit first degree murder, one count for each target victim.[1] *516 Clerk's Papers (CP) at 1-3. A jury convicted Jensen as charged. CP at 84-87. The trial court imposed consecutive sentences totaling 720 months. CP at 129-36.
¶ 10 Jensen appealed the convictions on various grounds. The Court of Appeals affirmed in an unpublished per curiam opinion. State v. Jensen, noted at 135 Wash.App. 1001, 2006 WL 2724069. This court stayed his petition for review pending the outcome of Varnell, then sought and obtained supplemental briefing on the applicability of that decision. We granted review only on the unit of prosecution issue. State v. Jensen, 162 Wash.2d 1018, 178 P.3d 1032 (2008)

ANALYSIS
¶ 11 The double jeopardy clause protects a person from being convicted more than once under the same statute for committing a single "unit of prosecution." State v. Westling, 145 Wash.2d 607, 610, 40 P.3d 669 (2002). To determine the unit of prosecution, this court first looks to the statute. State v. Adel, 136 Wash.2d 629, 634, 965 P.2d 1072 (1998). If the statute does not plainly define the unit of prosecution, we examine the legislative history to discern legislative intent. Id. Unless the legislature clearly and unambiguously intends to turn a single transaction into multiple offenses, the rule of lenity requires a court to resolve ambiguity in favor of one offense. Id. (citing Bell v. United States, 349 U.S. 81, 83, 75 S.Ct. 620, 99 L.Ed. 905 (1955)). The remedy for a double jeopardy violation is to vacate any multiplicious convictions. Westling, 145 Wash.2d at 612, 40 P.3d 669.
¶ 12 The solicitation statute, RCW 9A.28.030(1), provides:
A person is guilty of criminal solicitation when, with intent to promote or facilitate the commission of a crime, he offers to give or gives money or other thing of value to another to engage in specific conduct which would constitute such crime or which would establish complicity of such other person in its commission or attempted commission had such crime been attempted or committed.
¶ 13 In Varnell, we analyzed the unit of prosecution for solicitation to determine whether a single conversation in which the defendant solicited the commission of four murders supported multiple convictions. Varnell, 162 Wash.2d 165, 170 P.3d 24. The defendant in that case had offered an employee $50,000 to kill his ex-wife. The employee refused and contacted the police. The police arranged for Varnell to meet an undercover officer posing as a hit man. During a single recorded conversation, Varnell asked the detective to kill four people, including his ex-wife, her parents, and her brother. He offered $100 as a down payment. The State charged him with five counts of solicitation to commit murder: one based on the conversation with the employee and four based on the conversation with the detective.
¶ 14 In determining the unit of prosecution, this court analogized the crime of solicitation to the crime of conspiracy. Id. at 169-70, 170 P.3d 24 (citing State v. Bobic, 140 Wash.2d 250, 996 P.2d 610 (2000)). Whereas the conspiracy statute punishes the act of agreeing to undertake a criminal scheme, the solicitation statute punishes the act of engaging another to commit a crime. Both are inchoate crimes that target preparatory conduct without regard to whether the contemplated crime actually occurs.
¶ 15 In Varnell, we held that just as a single agreement to violate multiple statutes is a single unit of prosecution for conspiracy, a single enticement to violate multiple statutes is a single offense under the solicitation statute. The evil the solicitation statute criminalizes is the enticement to commit a criminal act; "[t]he number of victims is secondary to the statutory aim." Varnell, 162 Wash.2d at 169, 170 P.3d 24. The number of victims may be important, however, as evidence of the number of incitements.
¶ 16 Our analogy to conspiracy in Varnell is supported by the history of solicitation as a crime. The crimes of conspiracy and attempt have been part of Washington's criminal code since 1909. 13A Seth A. Fine & Douglas J. Ende, WASHINGTON PRACTICE: CRIMINAL LAW § 602, at 120 (2d ed.1998). In contrast, solicitation was not recognized as a statutory crime until 1975. *517 Laws of 1975, 1st Ex.Sess., ch. 260, § 9A.28.030. Before 1975, solicitation was punishable only when it ripened into a conspiracy or attempt. See State v. Gay, 4 Wash.App. 834, 486 P.2d 341 (1971) (affirming conviction for attempted murder where defendant "consummated a contract" with a purported hit man to kill her husband). This is consistent with the national trend. Under the common law, solicitation was not deemed serious enough to criminalize. Ira P. Robbins, Double Inchoate Crimes, 26 HARV. J. ON LEGIS. 1, 31 (1989).
¶ 17 In 1975, our legislature joined other jurisdictions in adopting a solicitation statute based on the Model Penal Code. The justification for penalizing solicitation is that the solicitor's conduct and state of mind is no less blameworthy than a conspirator's. Both crimes involve an effort to engage another person in joint criminal activity, with the specific intent to commit a crime, which gives rise to accomplice liability for any act attempted or actualized at the actor's request. Both present a special danger associated with group criminal activity. The difference between the two crimes is a mere fortuity. "[T]he fortuity that the person solicited does not agree to commit or attempt to commit the incited crime plainly should not relieve the solicitor of liability, when otherwise he would be a conspirator or an accomplice." Herbert Wechsler, William Kenneth Jones & Harold L. Korn, The Treatment of Inchoate Crimes in the Model Penal Code of the American Law Institute: Attempt, Solicitation, and Conspiracy (pts. 1 & 2), 61 COLUM. L.REV. 571, 622 (1961). According to the drafters of the Model Penal Code, "when the expected response to solicitation is withheld, exculpating the actor would involve inequality of treatment that would shock the common sense of justice." Id. at 572-73.
¶ 18 Solicitation is properly analyzed as an "attempt to conspire." Id. at 621; Robbins, supra, at 30 (characterizing solicitation as an alternative to the double inchoate crime of attempt to conspire). Whereas the actus reus of conspiracy is an agreement with another to commit a specific completed offense, that of solicitation is an attempt to persuade another to commit a specific offense. Viewed as attempted conspiracy, it would be anomalous to punish solicitation more severely than conspiracy. Imposing greater punishment based on the fortuity of the solicitant's response would "shock the common sense of justice" no less than imposing none.
¶ 19 Under the Model Penal Code, when the inchoate crime encompasses multiple criminal objectives, it should be punished more severely only to the extent punishment is fixed according to the grade of the most serious crime contemplated. Regarding the crime of conspiracy, the drafters' reason: "A rule treating the agreement as several crimes, equivalent in number and grade to the substantive crimes contemplated, might be unduly harsh in cases, uncommon though they may be, in which the conspirators are apprehended in the very early stages of preparation. The grandiose nature of the scheme might be more indicative of braggadocio or foolhardiness than of the conspirators' actual abilities, propensities, and dangerousness as criminals." Wechsler, Jones & Korn, supra, at 989.
¶ 20 This rationale applies as well to the crime of solicitation, which is the most inchoate of the three anticipatory offenses. In the crime of solicitation, criminal liability may attach to words alone. Solicitation involves no more than asking someone to commit a crime in exchange for something of value. Unlike conspiracy and attempt, it requires no overt act other than the offer itself. The risk of imposing an unduly harsh punishment is greater than in the crime of conspiracy because in the case of solicitation no steps to complete the potential crime are taken. If the solicitant agrees, the solicitor incurs criminal liability for conspiracy, and if the solicitant attempts to commit or accomplishes the crime, the solicitor is liable as an accomplice.
¶ 21 The State asks us to abandon our analysis in Varnell and adopt a "victim-centered" unit of prosecution analysis. In the State's view, we should overrule Varnell to the extent it holds the number of target victims is not the measure of the unit of prosecution for solicitation to commit murder. *518 The State contends Varnell is harmful because it reduces respect for the law by failing to recognize it is more blameworthy to solicit several crimes than one. According to the State, Varnell leads to the "incongruous result" that four telephone calls to solicit four people to commit one murder will support four separate convictions, while a single telephone call to solicit four murders will support only one conviction "notwithstanding the far greater harm that will follow if the solicitation is accepted and carried out." Suppl. Br. of Resp't at 16.
¶ 22 The State conflates the harm resulting from the enticement with the harm that would result if the contemplated crimes were realized. As discussed above, solicitation is an inchoate crime that is separate and distinct from the target offense. Wyatt v. Commonwealth, 219 S.W.3d 751, 758 (Ky.2007) (citing Braverman v. United States, 317 U.S. 49, 53, 63 S.Ct. 99, 87 L.Ed. 23 (1942)). The purpose of criminalizing solicitation is not to deter a person from committing the contemplated crime: that purpose is served by the penalties fixed for the contemplated crime. Rather, the solicitation statute aims to deter a person from enticing another person to commit a crime. See Varnell, 162 Wash.2d at 169, 170 P.3d 24 ("the appropriate focus of the crime of solicitation in Washington is on the enticement, not the specific criminal object or objects").
¶ 23 By offering something of value to another person to commit a crime, a solicitor supplies a motive that otherwise would not exist, thereby increasing the risk the greater harm will occur. The harm of solicitation is fully realized when the solicitor offers something of value to another person with the intent to promote or facilitate a target crime or crimes. If the greater harm of an attempted or completed crime occurs, the solicitor will be criminally liable for that greater harm under the principles of accomplice liability and will be punished accordingly.
¶ 24 Imposing cumulative punishment when the criminal objective is multiple rather than single does nothing to deter crime that is not accomplished by punishing the target crime. See Wechsler, Jones & Korn, supra, at 1029 ("It is doubtful, however, that the threat of punishment for the inchoate crime can add significantly to the net deterrent efficacy of the sanction threatened for the substantive offense that is the actor's object, which he, by hypothesis, ignores."). Nor would cumulative punishment advance the statute's purpose of permitting state intervention before a completed crime occurs. See id. at 572 (characterizing this purpose as the primary function of all inchoate crimes). The ability of the State to intervene before a contemplated crime occurs is triggered by the request, supported by consideration, whether the target crime is single or several.
¶ 25 In view of the harm the solicitation statute punishes, it is not incongruous to punish more severely a person who entices four people in four separate conversations to commit a single murder than one who entices one person to commit four murders in a single transaction. Four separate enticements produce more of the harm the solicitation statute aims to prevent. Separate enticements are more blameworthy because they increase the risk a completed crime will occur by exposing several people rather than one to the corrupting influence of the enticement.
¶ 26 The State poses another purportedly anomalous result. The State hypothesizes a solicitation to murder one person and knee-cap another. According to the State, because the punishment for solicitation, like attempt, is tied to the nature of the underlying crime, such a person necessarily would be liable for two counts of solicitation; one for murder and one for assault, whereas a person who solicits two murders would be liable for only one. On the contrary, the State's hypothetical solicitor would be liable for a single solicitation, with the punishment fixed according to the greater offense. Anticipatory offenses are punished according to "the most serious offense which is attempted or solicited or is an object of the conspiracy." Id. at 1028 (boldface omitted).
¶ 27 The State also argues that under Varnell the unit of prosecution is too difficult to apply. According to the State, defining the unit of prosecution in terms of the target *519 crimes would lead to "a more intuitive application of the law." Suppl. Br. of Resp't at 17. Whether true or not, it is not a persuasive reason to depart from the legislative intent apparent in the language and history of the solicitation statute.
¶ 28 Contrary to the State's suggestion, Varnell is not an outlier in its approach to the unit of prosecution for solicitation. The State offers no persuasive reason for overruling it. We reaffirm our holding in Varnell that the unit of prosecution for solicitation centers on the enticement, not the number of victims.
¶ 29 Turning to the application of our unit of prosecution analysis in this case, the State argues that Jensen may be held criminally liable for five solicitations, based on three separate conversations with Carpenter (each adding a potential victim) and two conversations with the undercover detective.
¶ 30 The record does not support the State's contention that Jensen's jailhouse conversations with Carpenter constitute distinct enticements. Carpenter and Jensen had a series of discussions while they were in jail. According to Carpenter's testimony, they discussed possible sums and methods of killing in a series of preliminary negotiations. Jensen indicated his interest in having Carpenter kill his wife, and possibly his sister-in-law and daughter, but said he needed time to "mull" things over. Eventually, Jensen agreed to pay Carpenter $150,000 for the killings. The plan was for Carpenter to kidnap them when they were all together, drug Jensen's wife, and drive them off a cliff to make their deaths look accidental. Jensen told Carpenter to make sure it happened by August before his trial started so his wife could not testify against him. Following a series of preliminary negotiations, Jensen offered Carpenter $150,000 to kill three people at the same time and place, and in the same manner.
¶ 31 It is clear from the record the solicitation of Carpenter was a "package deal" involving three victims. As in Varnell, the killings were to occur at approximately the same time and place, in the same manner, and based on a single overarching motive. It was understood the criminal objective would fail unless all the killings took place. Jensen's jailhouse solicitation of Carpenter involved a single enticement, supporting a single conviction, although it encompassed three potential victims.
¶ 32 As to whether the conversations with the undercover detective support an additional conviction, Jensen characterizes these conversations as "merely an addendum to the already negotiated agreement." Suppl. Br. of Pet'r at 8. This is true of the first conversation. According to the record, Carpenter phoned Jensen and told him to expect a visit from his "sister" to confirm the plans. Under police supervision, Carpenter wrote a letter detailing the proposed killings. The undercover detective held the letter up for Jensen to read through the glass window separating inmates from visitors. VRP (May 26, 2004) at 82-93. There is no evidence in the record that Jensen offered her anything. This conversation does not constitute a separate unit of prosecution. The detective was acting as an intermediary.
¶ 33 The State appears to suggest the conversation constitutes a separate unit of prosecution simply because it is a distinct conversation, occurring at a different time and place, and involving a different person. Contrary to the State's argument, this court's rejection of a "per capita" theory of solicitation in Varnell does not imply the adoption of a "per conversation" theory. Whether each conversation gives rise to a new unit of prosecution depends on whether the solicitation statute punishes an act or a course of conduct, an issue this court had no need to address in Varnell. "`The test is whether the individual acts are prohibited, or the course of action which they constitute. If the former, then each act is punishable separately[.]... If the latter, there can be but one penalty.'" Blockburger v. United States, 284 U.S. 299, 302, 52 S.Ct. 180, 76 L.Ed. 306 (1932) (holding that successive sales of narcotics constitute distinct offenses and may be separately prosecuted however close in time they occur) (quoting 1 Francis Wharton, A Treatise on Criminal Law § 34 n. 3 (11th ed *520 1912)).[2]
¶ 34 Like the conspiracy statute, the solicitation statute punishes a course of conduct, not a single act. See Braverman, 317 U.S. at 53-54, 63 S.Ct. 99 (characterizing conspiracy as a course of conduct crime). The prohibited course of conduct is attempting to engage another person to participate in a specific crime. This is an "inherently continuous offense." See In re Snow, 120 U.S. 274, 7 S.Ct. 556, 30 L.Ed. 658 (1887). The crime continues so long as the offer remains open, exposing another person to the corrupting influence of the enticement.
¶ 35 Unlike conspiracy, however, a new or separate and distinct request may constitute a fresh enticement that supports a separate conviction. See Putty v. Commonwealth, 30 S.W.3d 156 (Ky.2000) (affirming four convictions of solicitation to murder a single victim, where the defendant made repeated offers to two different people after being rejected by each at different times and places, and offered additional consideration to enhance the enticement). Thus, in Varnell, this court concluded the facts supported two convictions where the defendant solicited an undercover detective after his employee rejected a similar offer. The solicitation of the undercover detective was "separate and distinct" from the solicitation of the employee because it constituted a fresh enticement after the first attempt failed. Varnell, 162 Wash.2d at 172, 170 P.3d 24.
¶ 36 As applied to this case, the first conversation with the undercover detective does not constitute a separate enticement. Carpenter had accepted Jensen's offer, and the purpose of the meeting was to confirm the details. There is no indication Jensen attempted to engage the detective in the criminal enterprise during their initial meeting. Rather, he was communicating to her as Carpenter's emissary. Thus, the meeting was part of the same course of conduct comprising the first unit of prosecution.
¶ 37 The State argues, though, that the addition of "Lisa" as Carpenter's would-be crime partner itself gives rise to a separate unit of prosecution. The solicitation statute prohibits making the offer "to another." Relying on State v. Graham, 153 Wash.2d 400, 103 P.3d 1238 (2005), the State suggests the statutory language supports a separate conviction for each person exposed to the solicitation. In Graham, this court concluded the crime of recklessly endangering "another person" is "victim-specific," with each potential victim constituting a separate unit of prosecution. Id. at 410, 103 P.3d 1238.
¶ 38 In the context of the solicitation statute, it is more sensible to interpret "another" as "every and all." A paradigmatic case of solicitation occurs when a person on a platform incites a crowd to engage in criminal conduct. See, e.g., State v. Schleifer, 99 Conn. 432, 434, 121 A. 805 (1923) (union leader urged striking railway workers to "[t]ake [scabs] in a dark alley and hit them with a lead pipe"). The essence of the crime is the attempt to persuade someone other than oneself to act as one's agent in committing a specific crime. The crime is the same when the enticement is made simultaneously to many people. See 2 Wayne R. LaFave, Substantive Criminal Law § 11.1(c), at 198 (2d ed.2003). Just as the unit of prosecution for conspiracy does not multiply with the addition of coconspirators, the unit of prosecution for solicitation does not multiply when the offeree brings in his or her crime partners. Thus, the first conversation between Jensen and the undercover detective is part of the same course of conduct as the original enticement.
¶ 39 Nevertheless, the second conversation between Jenson and "Lisa" does support a separate charge. When Jensen learned "Lisa" and her "buddy" would be doing the killings instead of Carpenter, he offered an additional $50,000 to have his son killed. Because Carpenter refused to murder the boy, Jensen's offer constitutes a fresh enticement that supports a second conviction.

*521 CONCLUSION
¶ 40 We reaffirm our holding in Varnell that the unit of prosecution for solicitation centers on the enticement, regardless of the number of crimes or objects of the solicitation. The unit of prosecution does not multiply with the mere addition of purported crime partners. However, a separate unit of prosecution arises when the facts support the conclusion the defendant enticed a different person, at a different time and place, to commit a distinct crime.
¶ 41 We hold that the facts of this case support two convictions of solicitation to commit murder. The jailhouse conversations with Carpenter constitute a single solicitation that continued through the conversations with the undercover detective. The second conversation with the undercover detective supports a separate conviction because it constitutes a fresh enticement to solicit the murder of Jensen's son. We reverse and remand for vacation of two convictions and for resentencing.
WE CONCUR: Chief Justice GERRY L. ALEXANDER, SUSAN OWENS, CHARLES W. JOHNSON, MARY E. FAIRHURST, RICHARD B. SANDERS, DEBRA L. STEPHENS, and TOM CHAMBERS, Justices.
J.M. JOHNSON, J. (dissenting)
¶ 42 I must reiterate my dissent articulated in State v. Varnell, 162 Wash.2d 165, 170 P.3d 24 (2007). Here, William Jensen actively solicited a fellow inmate to kill four members of his family. Each murder or attempted murder would have constituted a separate crime. See RCW 9A.32.030(1)(a). It should not matter if Jensen solicited one person to kill four family members or four people to kill four family members. Our legislature has provided it is the number of potential victims that determines the units of prosecution for solicitation.
¶ 43 Here, Jensen solicited a fellow inmate to murder four members of his family. The inmate agreed to kill three of them, but not the youngest victim. Jensen then made a solicitation to a different person he believed was working with the inmate and offered additional money to murder the youngest victim as well. A jury convicted Jensen with four counts of solicitation to commit first degree murder.
¶ 44 I would defer to the jury. In my opinion, the majority mistakenly applies principles surrounding conspiracy, an entirely separate crime and statute. Where there are four potential victims and four potential crimes (each a murder) the legislature provided for four separate counts of solicitation. I believe this to be consistent with the statutory language and intent of RCW 9A.28.030(1), while also providing proper protection for each potential victim and substantially higher disincentive for hiring for multiple murders. I would uphold the jury conviction on all four counts of solicitation of first degree murder and respectfully dissent.
NOTES
[1] The wording of each of the four counts is identical except for the name of the intended victim. Each count alleges that Jensen "during a period of time intervening between July 1, 2003 through July 26, 2003, with intent to promote and facilitate the commission of a crime, to-wit: Murder in the First Degree of [name of victim], offered to give and gave money to another to engage in conduct which constitutes such crime and which would establish complicity of such other person in its commission or attempted commission had such a crime been attempted or committed." Clerk's Papers at 1.
[2] This method of statutory analysis is distinct from the more familiar "Blockburger rule," announced later in the same case, which determines the permissibility of multiple convictions when a single act violates several statutes.