IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 38799-2-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| KALLEE ANN KNUDSON, | ) | |
| | ) | |
| Appellant. | ) | |

FEARING, C.J. — A jury convicted Kallee Knudson of twelve crimes stemming from her harassment of a perceived enemy. On appeal, Knudson challenges the sufficiency of evidence for six of her convictions. She also contends her trial counsel performed ineffectively. We affirm her convictions but remand for the striking of discretionary legal financial obligations.

## FACTS

We begin with the ongoing relationship between Kallee Knudson and her victim, Janie Commeree. This narration explains the motive behind the crimes. We later relay the events that led to and constituted the crimes. One could use a list of characters to follow the facts behind Kallee Knudson's prosecution.

Janie Commeree (now Janie Avey) met Kallee Knudson in 2013 when Commeree and her then-boyfriend, Skylar Schiller, dined at Wing Central in Ellensburg. Knudson then worked at Wing Central. Knudson and Schiller had dated, but Schiller ended the

relationship because Knudson had a son and Schiller did not wish to raise children. Commeree and Knudson saw one another on other occasions, usually in Wing Central or Ellensburg bars. Knudson sent Commeree a message on Facebook messenger inquiring as to whether Commeree wished to work at Wing Central.

Janie Commeree commenced employment at Wing Central with Kallee Knudson in March 2013. The relationship between the two women soon soured. Commeree spoke negatively about her friend Brittnee Erker to Knudson via text message. Knudson shared a screenshot of the text message with Erker. Knudson often complained about Commeree to Wing Central supervisors and coworkers. Knudson enlightened Commeree's boyfriend, Skylar Schiller, about Commeree's purported flirting with male customers. Schiller grew jealous, and Commeree ended the couple's relationship.

We move forward four years to 2017. By that year, Janie Commeree and Kallee Knudson had left employment at Wing Central, but both continued to reside in Ellensburg. Knudson worked as a clerk at the Kittitas County Sheriff's Office. The two women shared mutual friends in Molly and Zach Winters.

Kallee Knudson discovered that Aaron Avey, a corrections officer and later the husband of Janie Commeree, knew the Winters. Knudson sent Avey a message via Facebook messenger, and the two periodically conversed on that platform. The two began dating in the summer of 2017. The Winters, Avey, and Knudson socialized at restaurants and bars and took camping trips together. Molly Winters did not ask her

2

friend, Commeree, to accompany them on these outings because of the antipathy between Knudson and Commeree.

In July 2017, Janie Commeree accompanied Molly Winters as Winters' guest on a women's camping trip. Kallee Knudson did not receive an invite. During the trip, Winters received from Knudson screenshots of a text conversation Knudson claimed Commeree's roommate, Ali, sent her. The screenshots depicted a text conversation between Ali and Commeree, wherein Commeree complained about an unenjoyable camping trip and accused Molly Winters as being "obnoxious and annoying." Report of Proceedings (RP) at 352. After viewing these screenshots, Winters confronted Commeree. Commeree disclaimed any knowledge of the text messages. Winters inquired of Ali, who also protested any familiarity with the screenshots. Winters then noticed that the screenshots Knudson forwarded to her of alleged texts from Ali displayed a Verizon logo at the top of the image. The logo signaled that Verizon serviced the phone, on which the screenshots were taken. AT&T, not Verizon, serviced Ali's phone.

A suspicious Molly Winters messaged Kallee Knudson and requested that Knudson send her the phone number Knudson claimed had sent the screenshots. Winters called the number given by Knudson. The phone number was not in service. When Winters informed Knudson of the inactive phone number, Knudson insisted that someone possessing that phone number had messaged her. Knudson accused Ali and Commeree of lying to Winters.

After arriving home from the women's camping trip, Molly Winters asked Kallee Knudson to bring her phone to Winters' house so that Winters could review the screenshots. Knudson agreed. Minutes later, Winters received a notification on Snapchat from a device of Knudson's other than her phone, in which message Knudson declared that she dropped her phone in a pool. Knudson lamented that she could not bring her phone to Winters for the latter's inspection.

We move forward one additional year to late 2018. Kallee Knudson ended her dating relationship with Aaron Avey because she wanted a boyfriend who would stay home with her and her children. After the separation, Avey hosted a New Years party at his family's cabin. His brother Austin, Molly and Zach Winters, and Janie Commeree attended. Knudson was not invited.

Aaron Avey hosted a second party at the cabin on January 12, 2019. Avey, Austin, Molly and Zach Winters, and others attended this party. Kallee Knudson and Janie Commeree did not. Brother Austin took a video of people dancing at the party and posted it on Snapchat for others to see.

On January 14, 2019, "Anita Frangella" sent Aaron Avey's mother an email at her Alaska Airlines work email address. In the email, Frangella complained, on behalf of a homeowners association, about wild behavior at the Avey cabin during the January 12 party. Frangella grumbled about drunk men urinating outside the cabin and littering with beer cans. Partygoers denied to Avey's mother such behavior. The bottom of Frangella's

4

email posted a link to a Snapchat video taken by a partygoer of two individuals inside the cabin during the party.

Aaron Avey mentioned, to Molly Winters, the suspicious email his mother received. The two concluded that Kallee Knudson created the fictitious name of "Anita Frangella" and sent the email for the purpose of getting "back at Aaron." RP at 362-63.

Aaron Avey, Janie Commeree, and Zach Winters took a photograph together at the Buzz Inn and posted the picture on Facebook with the knowledge that Kallee Knudson would dislike seeing Avey and Commeree together. Commeree and Avey did not date then. The Facebook entry revealed that the group knew that Knudson was acting as Frangella.

In January 2019, Kallee Knudson requested a friend, Thomas "D.J." Sluman, to steal a bag of garbage from behind Janie Commeree's house and bring it to Knudson. After acquiring possession of the garbage, Knudson strewed bottles and a can outside her house to present an impression of mischief to an onlooker.

On another day in January 2019, Kallee Knudson reported to law enforcement a home burglary. Ellensburg Police Department Corporal Joshua Ingraham responded to the report. The burglar thrust open Knudson's garage door with his or her foot. The prowler wrote "Anita, f--k you" with lipstick on Knudson's bathroom mirror. RP at 601. Knudson reported missing $1,000 in cash, a computer, and some firearms. She advised Ingraham that she had recently broken up with Aaron Avey and accused Avey or a friend

of the burglary. Knudson volunteered that Avey had known the location of the cash. Avey became the number one suspect in law enforcement's investigation of the burglary.

On an unspecified day in January 2019, Kallee Knudson asked Thomas Sluman again for help in responding to someone threatening her or her family. Knudson asked Sluman to meet and bind Janie Commeree. Knudson wanted to speak with Commeree face to face. Sluman responded that the job required two people.

After her conversation with Thomas Sluman, Kallee Knudson phoned Cameron Nelson and asked to meet with him to discuss a task she wished him to perform. Knudson and Nelson met in person for ten minutes. Knudson did not explain the nature of the task. Knudson handed Nelson a piece of paper containing Janie Commeree's name and the date of Commeree's birthday. Knudson asked Nelson to meet with Sluman.

The day after Cameron Nelson and Kallee Knudson's rendezvous, Nelson and Thomas Sluman met with Knudson at her home. Knudson explained to the two men that she needed assistance in acquiring possession of Janie Commeree's cell phone because Commeree reported Knudson to Child Protective Services (CPS). Knudson stated she wanted to have a face-to-face conversation with Commeree. Knudson wished Nelson and Sluman to break into Commeree's home, use zip ties or duct tape to restrain Commeree, and sedate Commeree using Xanax in order to seize the phone. Knudson desired Commeree to be rendered unconscious to prevent her from observing the pilfering. Nelson advised Knudson that Xanax would not render Commeree insentient.

6

Knudson inquired if heroin would accomplish the desired result. Knudson then displayed a syringe containing a dark liquid, like heroin. Nelson warned Knudson that even a small dose of the heroin could lead to an overdose. Knudson remarked that she did not care if Commeree died. Knudson offered Nelson and Sluman money in exchange for their executing her plan. She added that she would care for the two financially and afford them alibis. Knudson told Nelson she worked for law enforcement and she was a "good person to know." RP at 990. She could remove a red-flag from his digital police file in exchange for his agreeing to assist her. The "red flag" signaled to law enforcement that it needed to serve civil process on Nelson. After explaining the details of her plan, Knudson drove Nelson and Sluman to Commeree's residence and asked the duo to execute her plan that night. The two declined. At some unidentified time, Knudson removed the "red flag" in Nelson's police file.

On January 25, 2019, Kallee Knudson contacted Thomas Sluman again and said that, if he would complete her plan that day, she would pay him $1,000. Knudson wanted the task performed that day because it was Janie Commeree's birthday. Instead of executing Knudson's plan, Sluman paid an unidentified person $20. At Sluman's request, the person approached the front door of Commeree's home, asked to use her phone because his car had broken down, and scrammed with the phone once Commeree handed it to him. Sluman believed that Knudson only desired possession of the phone and accomplishment of that task would end her entreaties.

7

We move to events regarding a second cell phone. Amanda Panattoni, Cameron Nelson's girlfriend, perused the cell phone of Nelson. Panattoni saw a text conversation with a number she did not recognize. The owner of the number had sent Nelson a text reading: "did you have fun last night?" RP at 875. As Panattoni scrolled further, she recognized a picture of Kallee Knudson's tattoo from a photoshoot of Knudson because Panattoni works at the salon that prepared Knudson for the photoshoot. Panattoni had seen the tattoo multiple times. Knudson had earlier called Panattoni to advise her that Nelson had been stalking Knudson.

Amanda Panattoni questioned Cameron Nelson about the text from Kallee Knudson. Nelson showed Panattoni a paper listing Janie Commeree's schedule. Nelson added that Knudson desired to tie up Commeree, take Commeree's phone, and cause Commeree to overdose.

Cameron Nelson worried that Kallee Knudson intended to frame him for crimes. Nelson spoke with Amanda Panattoni's father Steve Panattoni, the superintendent of the Kittitas County Jail. Thomas Sluman also chose to speak with law enforcement about Knudson's plan because of Knudson's obsession over harming Janie Commeree.

On January 31, 2019, Cameron Nelson and Thomas Sluman met with Superintendent Steve Panattoni and other officers of the Kittitas County Sheriff's Office. Sluman signed a confidential informant contract on February 4, 2019.

On February 5, 2019, Thomas Sluman, while wearing a recording wire, met again with Kallee Knudson. Knudson passed Sluman $500 during their meeting. She repeated her desire for Sluman to bind Janie Commeree so that Knudson could speak with her, then drug Commeree into unconsciousness so that she would not remember the events, and steal the phone. We do not know why the theft of Commeree's first phone did not suffice. Knudson intended to send messages to others from Commeree's phone. During this recorded meeting, Sluman asked Knudson numerous times whether she "was sure" about executing the plan. Knudson responded: "Absolutely." RP at 1414. Sluman delivered the $500 to law enforcement after the meeting.

Still on February 5, law enforcement visited Janie Commeree's place of employment and notified her that Kallee Knudson had hired men to kidnap Commeree and inject her with heroin. Commeree gave law enforcement permission to use her residence to stage a sting operation.

On February 5, Detective Derek Holmes, Sergeant Josh Bender, Detective John Bean, and Thomas Sluman traveled to Janie Commeree's house and established an operation inside. Sluman communicated with Kallee Knudson by text message. Law enforcement officials, in real time, observed Sluman's text message conversation with Knudson and suggested wording for the messages. Knudson sent Sluman a text telling him she was outside Commeree's residence. Sluman informed Knudson that he was in

9

the house with Commeree and asked Knudson to enter the premises. Knudson requested

that Sluman send her a picture of a bound Commeree. Sluman refused and texted:

> I'm not going to send you a picture. Come inside. This is what you
> wanted. Come inside.

RP at 1418.

Kallee Knudson, wearing all dark clothing, except rainbow-colored gloves,

entered Janie Commeree's dwelling. She also bore "dark-colored hair extensions" to

hide her blonde hair. RP at 1143. Sheriff deputies arrested Knudson once she entered the

home.

At the time of her arrest inside Janie Commeree's residence, Kallee Knudson's

pocket carried nine 5-milligram Oxycodone pills and a note with the email address

"'anitafrangellallc@gmail.com.'" Clerk's Papers (CP) at 161. After garnering a search

warrant, officers searched her car and seized a prescription bottle, bearing Knudson's

name, with twenty-two additional Oxycodone pills. The bottle directed Knudson to take

one to two pills every four hours. After the arrest, sheriff deputies also procured a search

warrant to seize Knudson's cell phone in order to review text messages.

The State theorized that Kallee Knudson intended to force ingestion of the pills on

Janie Commeree. At trial, the State presented expert testimony from toxicologist Brian

Capron about the nature of Oxycodone.

> Q. Okay. You said that Oxycodone was an opioid. What class does
> it fall under?

10

A. Narcotic analgesic.

Q. What are the effects of Oxycodone?

A. So it's prescribed to treat pain. . . . When you start taking Oxycodone for the first time, if your body is not used to it, it's going to make you very tired and very lethargic. It can upset your stomach as well.

. . . You would have to be prescribed it and taking the prescribed dose regularly in order to build up the tolerance.

Q. What systems within the body are affected by Oxycodone?

A. The central nervous system, the brain. When you take something like Oxycodone, once it's absorbed into the bloodstream and circulating through the body, it going to affect the brain. There is opioid receptors in the brain. One is called the neuroreceptor. That's the one that kind of modulates breathing.

What you can see with narcotic analgesics, where the danger of those starts to come in, it affects your breathing. Breathing can become more and more shallow.

Individuals who overdose or use heroin, for instance, it's the same thing that's happening. Basically the body is being overwhelmed. The brain is not functioning normally. It's not able to regulate breathing. You're getting a lack of oxygen to your brain, which is causing issues.

You could have a buildup of carbon dioxide in the blood because you're not getting that full respiration. Your diaphragm, which helps move your lungs and move the air through the body, it's not working the same.

Essentially if somebody takes too much of a narcotic, it's almost like drowning. Your lungs start to fill up with fluid. It's called pulmonary edema. You could go into a coma and you could die.

Q. I notice the prescription bottle says take one every four hours. What's the relevance of that?

A. Yeah. It's one to two tablets by mouth every four hours just depending on the level of pain somebody is in. That's what the prescription says, you could take one to two. . . .
.

Q. Is there a different effect in taking more than one at a time?

A. . . . If your body is not used to it, you're not prescribed it, obviously it's going to have a more profound effect on an individual as compared to somebody prescribed and taking it.

. . . .

Q. Okay. What would be the impact when it hits the bloodstream?

A. Well, that would not be taking this medication as prescribed, for one. Depending on that individual, if that individual is not used to having an opiate in their body, it could lead to some serious outcomes for that particular individual.

Q. Could it lead to death?

A. Potentially.

Q. Does it affect the ability to reason and rationalize?

A. It definitely could. If your brain is being depressed, your normal body functions are not firing on all cylinders. You have clouded thoughts and judgment, have confusion.

Q. Could it affect your ability to seek help?

A. Potentially.

. . . .

Q. What does the ingestion of a massive amount of Oxycodone do to the heart rate?

A. It's going to slow down the heart rate.

Q. What are most deaths from narcotic overdoses? I mean, what are the stages that lead to the death?

A. Again, your respiration becomes slower. Your heart rate slows down. Your blood pressure lowers. You have a buildup—you can have a potential buildup of carbon dioxide in your blood, a lack of oxygen to the brain. You can see how you're declining and declining. You could start to become very incoherent. You could slip into a coma. If it's not treated and it's a serious enough amount, it could lead to death.

Q. So nine pills at .5 milligrams is how much Oxycodone?

A. So they're actually—you said .5 milligrams. I believe that they're 5 milligram tablets.

Q. Excuse me. I keep saying .5. It's 5 milligrams.

A. So that would be 45 milligrams of Oxycodone in the bloodstream all at once. Is that what you're asking?

Q. Yes.

A. What would that effect be?

Q. Yes.

A. Again, somebody who is not used to the effects of that, it could be very detrimental. Also, if an individual who is taking that is taking other medications, then you could have multiple interactions with other drugs. If you are taking a drug already, let's say a prescription that causes, you know, depression of your senses and then you add another drug that does

the same thing, it's just magnified.  That could also result in a negative outcome.

Q. Could exacerbated or magnified by the use of heroin?

A. It certainly could.  Now you're combining two narcotics together, heroin and Oxycodone.

Q. Okay.  If an individual had no history of using either Oxycodone or heroin and they were 5' 3", weighed 120 pounds, could that be a lethal dosage?

A. Looking at literature, what a 5-milligram tablet could raise someone's blood level to and then extrapolating if you took nine of those and got that dose all at once, what that level potentially could be, you could be in that range of reported individuals who died as a result of Oxycodone ingestion.

Q. Would the position of the individual who took or was forced to take these Oxycodone make a difference?  Say they were zip tied and duct taped to a chair.  Would that affect how the drug might impact them or their ability to seek help?

A. I would assume if they're zip tied to a chair and can't seek help, that would obviously have a negative impact.  Depending on if they're bound and having trouble breathing to begin with and then having pills given to them as well, it could magnify it potentially.

Q. It's conceivable they would start to lose consciousness and their head would drop forward?

A. They could potentially.

Q. Would that exacerbate their inability to breathe?

A. It certainly could.

Q. You've done some research on fatality ranges for Oxycodone?

A. Yes.

Q. You've told us this is a dosage of about 45 milligrams.  Could you tell us what ranges you've seen of Oxycodone ingestion that leads to fatality?

A. So there's very few published research out there with Oxycodone only, but I have seen reported levels of less than around .12 milligrams per liter of blood.  One of these tablets raises your blood to about a .02.  If you had nine and could get that into your system all at once, let's say, so nine times a .02 would be a .18.  Just looking at it that way, that would fall in that lethal range in the peer reviewed journal articles out there.

Having worked in the field for toxicology for many years, I've seen individuals who have died at all sorts of levels, super high levels, super low

levels.  Again, I don't know the circumstances of their deaths a lot, whether they took something and fell down and hit their head and that's why they died or not.  I've seen Oxycodone levels vary from very low to very high.

. . . .

Q. Just to reiterate, if a person were petit and had no drug usage history, it would have a far more detrimental effect than somebody who had a history and had more body mass to absorb the drug?

A. Yes. Somebody who's not used to having this particular drug, it's going to affect them more than somebody who is prescribed and taking it.

RP at 1331-37.

After Kallee Knudson's arrest, Thomas Sluman delivered to law enforcement screenshots of the text message conversation he had with Kallee Knudson the day of her arrest.  Sluman also granted law enforcement permission to use his phone to capture other text message conversations between himself and Knudson.

PROCEDURE

The State of Washington charged Kallee Knudson with thirteen crimes: first degree attempted murder, first degree attempted assault, first degree attempted kidnapping, two counts of criminal solicitation to commit assault, two counts of criminal solicitation to commit kidnapping, possession of a controlled substance with the intent to deliver, residential burglary, making a false or misleading statement to a public servant, making false claim of proof, first degree theft, and criminal impersonation.  The two counts of solicitation for the two substantive crimes resulted from Knudson importuning both Thomas Sluman and Cameron Nelson.

The jury found Kallee Knudson guilty on all charges except attempted murder.

14

The court declared a mistrial on that charge due to a hung jury.

At sentencing, the parties briefed and argued the question of double jeopardy in the context of the merger doctrine, as applied to the Sentencing Reform Act's "same criminal conduct" language in RCW 9.94A.589. The trial court commented:

> What's been brought to me is whether the court should analyze Counts 2 through 9 as the same course of criminal conduct. What I've read and the cases and the materials that have been provided to me has been helpful. I think that both counsel have valid points that need to be made here.
>
> When I look weather [sic] this is the same course of conduct for this legal analysis, I look at the criminal intent viewed objectively and whether it's changed from one offense to the next. I'm guided very much by <u>Dunnaway</u> [sic]. In this case, I think the objective purpose as found by the jury was to kidnap and administer Oxycodone on Ms. Commeree to make her text messages from her phone seem more credible.
>
> With that concept or with that framing of the plan, I think that Counts 2 and 3, the attempted assault and the attempted kidnapping can be considered to be a common scheme. They include the same intent to cause bodily injury and had the same criminal intent. One crime furthered the other and was part of the ultimate objective. It was in the same place, time, involved the same victim.
>
> With regard to Counts 4, 5, 6 and 7, this is criminal solicitation to assault and criminal solicitation to kidnap involving Mr. Sluman and Mr. Nelson. I think that each crime, each of these four crimes can be consolidated to two.
>
> Counts 4 and 6 involving Mr. Sluman, the criminal solicitation to assault and the criminal solicitation to kidnap, do show a common scheme. That was, again, to solicit them to kidnap and administer Oxycodone.
>
> When I think about solicitation, I don't think that this is the same as Counts 2 and 3. The reason for that is that the unit of prosecution is the enticement. We focus on that, the enticement.
>
> I think the harm to the community and the victim as the community is different than Ms. Commeree by herself. The harm of enlisting others to commit criminal acts is very serious. So I'm viewing Counts 4 and 6 and 5 and 7 as separate crimes from 2 and 3.

15

RP at 1865-66.

In line with its oral ruling, the sentencing court resolved Kallee Knudson's merger contention by consolidating counts 2 (attempted assault in the first degree) and 3 (attempted kidnapping in the first degree), counts 4 and 6 (solicitation of Thomas Sluman to commit two felonies), counts 5 and 7 (solicitation of Nelson to commit two felonies). In conformance with these mergers, Knudson's sentence reads that counts 2, 3, 4, 5, 6, and 7 run consecutive to each other but concurrent with the sentences imposed for counts 8 through 13, with zero months of confinement imposed on counts 3, 6, 7, 10, 11, and 13. CP 1538.

During sentencing, the sentencing court and counsel discussed imposition of legal financial obligations on Kallee Knudson:

> THE COURT: . . . As I look at the legal-financial obligations, the court costs are waiveable [sic]. I'll waive those.
> The victim assessment fee is not.
> The drug enforcement fund, I understand that's a waiveable [sic] fee.
> MR. WILL: I believe so.
> MR. ZEMPEL: It depends on the judge.
> THE COURT: It's a waiveable [sic] fee.
> The crime lab fee is suspended due to indigency.
> The DNA collection fee, if that has not been collected then that's not a waiveable [sic] fee.
> The booking fee is waiveable. [sic]
> My math, not counting restitution, the total is $900.

RP at 1875. The sentencing court did not record in the judgment and sentence that Knudson was indigent at the time of sentencing. *See* CP 1537, 1539, 1540.

16

On the day of sentencing, Kallee Knudson filed a motion for an order of

indigency, in which she requested the superior court to authorize expenditure of public

funds for the purpose of this appeal.  CP 1577-80.  Days later, the superior court signed

an order of authorization.  CP 1588.

## LAW AND ANALYSIS

On appeal, Kallee Knudson challenges the sufficiency of evidence for six of her

convictions.  She also claims her trial counsel performed ineffectively by failing to seek

to quash the search warrant for her cell phone and by failing to propose a multiple and

distinct acts jury instruction.  Finally, she challenges the imposition of discretionary legal

financial obligations.

### Sufficiency of Evidence

Kallee Knudson argues that the State presented insufficient evidence for six of her

twelve convictions: one count of attempted assault in the first degree, one count of

attempted kidnapping in the first degree, two counts of criminal solicitation involving

Cameron Nelson, one count of possession of a controlled substance with intent to deliver,

and one count of first degree theft.  We review each conviction separately.

We review insufficient evidence claims for whether, when viewing the evidence in

the light most favorable to the State, any rational trier of fact could have found the

elements of the charged crime beyond a reasonable doubt.  *State v. Embry*, 171 Wn. App.

714, 742, 287 P.3d 648 (2012).  Sufficiency challenges admit the truth of the State's

evidence and all reasonable inferences drawn from it. *State v. Embry*, 171 Wn. App. 714, 742 (2012). In analyzing the sufficiency of evidence, this court does not treat circumstantial evidence as less reliable than direct evidence. *State v. Delmarter*, 94 Wn.2d 634, 638, 618 P.2d 99 (1980). This court does not review the trier of fact's determinations on credibility and defers to the trier of fact with respect to conflicting testimony and the persuasiveness of evidence. *State v. Embry*, 171 Wn. App. 714, 742 (2012).

*Attempted Assault in the First Degree*

Kallee Knudson argues that insufficient evidence supports her conviction for attempted assault in the first degree because the evidence presented at trial did not establish that she took a substantial step toward committing the crime nor did it establish that she intended to inflict great bodily harm on Janie Commeree.

RCW 9A.28.020(1), Washington's attempt statute, declares:

> A person is guilty of an attempt to commit a crime if, with intent to commit a specific crime, he or she does any act which is a substantial step toward the commission of that crime.

Conduct amounts to a substantial step if it is "strongly corroborative of the defendant's criminal purpose." *State v. Wilson*, 158 Wn. App. 305, 317, 242 P.3d 19 (2010). Any act done in furtherance of the crime constitutes an attempt if it shows the design of the defendant to commit the crime. *State v. Wilson*, 158 Wn. App. 305, 317 (2010).

RCW 9A.36.011, Washington's first degree assault statute, reads:

18

(1) A person is guilty of assault in the first degree if he or she, with intent to inflict great bodily harm:

(a) Assaults another with a firearm or any deadly weapon or by any force or means likely to produce *great bodily harm or death*; or

(b) Transmits HIV to a child or vulnerable adult; or

(c) Administers, exposes, or transmits to or causes to be taken by another, poison or any other destructive or noxious substance; or

(d) Assaults another and inflicts great bodily harm.

RCW 9A.36.011 (emphasis added). As the State charged Kallee Knudson with attempted first degree assault in violation of RCW 9A.36.011(1)(a), the State bore the burden of proving she intended to assault Janie Commeree with a firearm, with a deadly weapon, or by any force or means likely to produce great bodily harm or death and took a substantial step toward this goal. RCW 9A.04.110(4)(c) defines great bodily harm as:

bodily injury which creates a probability of death, or which causes significant serious permanent disfigurement, or which causes a significant permanent loss or impairment of the function of any bodily part or organ.

The State relied on Kallee Knudson's possession of Oxycodone to establish the design to cause great bodily harm. Knudson argues that the nine Oxycodone pills she carried into Janie Commeree's residence were not likely to produce great bodily harm or death. Knudson characterizes expert Brian Capron's testimony as speculative because he testified to a hypothetical person ingesting too much of the drug. According to Knudson, this speculative evidence fails to establish beyond a reasonable doubt that Knudson intended to cause Commeree to suffer great bodily harm or that Commeree could have suffered great bodily harm from ingesting the pills.

19

The underlying facts as to Kallee Knudson's plan combined with the expert testimony of toxicologist Brian Capron constituted strong evidence sufficient to convict Knudson of first degree assault. Knudson initially intended to use Xanax to sedate Janie Commeree, but after learning Xanax would likely lead to Commeree being in a good mood when she awoke, Knudson proposed employing heroin. Knudson showed Cameron Nelson and Thomas Sluman a syringe holding a dark substance that looked like heroin. When Nelson warned Knudson that even a small dose of heroin could prompt an overdose, Knudson responded that she did not care if Commeree died.

Kallee Knudson conveyed forty-five milligrams of Oxycodone into Janie Commeree's residence. Knudson's car, parked outside Commeree's home, contained twenty-two additional Oxycodone pills. Expert Brian Capron testified at trial that ingesting forty-five milligrams of Oxycodone could be "very detrimental" and possibly lethal for an individual who had not ingested the drug before. RP at 1334-35. Capron added, that if an individual who stood at 5' 3" and weighed 120 pounds consumed forty-five milligrams of Oxycodone at once, her blood level "could be in that range of reported individuals who died as a result of Oxycodone ingestion." RP at 1335. Capron opined that heroin could exacerbate the effects of the Oxycodone. Capron testified that Oxycodone affects one's brain. When one overdoses on Oxycodone, the body becomes overwhelmed, the brain does not function normally, and one encounters breathing difficulties. The lungs fill with liquid, which leads to a coma and eventually death.

Under the evidence, Kalle Knudson's plan would have significantly impaired the function of Janie Commeree's bodily organs. In *People v. Stiller*, 242 Mich. App. 38, 617 N.W.2d 697 (2000), the appellate court affirmed a conviction for second degree murder because of testimony that the large quantities of medicine prescribed by Ernest Stiller created a probability of great bodily harm.

Brian Capron did not testify that, more likely than not, Kallee Knudson's plan to forcefully administered Janie Commeree with the Oxycodone pills combined with an injection of heroin would have caused death. But the testimony of probable significant interference in bodily functions allowed a reasonable jury to conclude that Knudson attempted to produce great bodily harm.

Kallee Knudson asserts the defense that the nine prescribed Oxycodone pills served a lawful purpose such that her possession of the pills could not count in assessing the attempt to commit a crime. The Model Penal Code, as mentioned in *State v. Workman*, 90 Wn.2d 443, 451 n.2, 584 P.2d 382 (1978), recognizes such a defense, but the Washington Legislature has never adopted the defense. Regardless, Knudson's argument fails to recognize that she wanted to force feed Janie Commeree, someone not prescribed the pills, with the Oxycodone in an amount beyond the permitted dosage. A lawful instrument may be used in felonious ways.

Kallee Knudson also insists that the State failed to satisfy the attempt element of the crime of attempted first degree assault. We disagree. Knudson crafted her detailed

21

plan to assault Janie Commeree days before walking into Commeree's residence. She solicited two individuals to assist her in executing the plan. Knudson initially intended to use Xanax but switched the drug of choice after learning Xanax would place Commeree in a good mood. She proposed using heroin, a dangerous drug she possessed. Oxycodone also bears strong results on the body. Knudson entered Commeree's home carrying nine Oxycodone pills after Thomas Sluman indicated to her that Commeree had been restrained. This evidence shows Knudson's criminal purpose to commit first degree assault. She took substantial steps to consummate her plan to kidnap and drug Commeree and to steal her phone.

*Attempted Kidnapping in the First Degree*

Kallee Knudson argues that insufficient evidence supports her conviction for attempted first degree kidnapping for two reasons. First, the evidence did not show that she took a substantial step toward committing the crime. As to this first contention, Knudson asserts that, although she and Thomas Sluman discussed restraining Commeree and injecting Commeree with opioids, the two had only engaged in negotiations by the time Sluman entered Commeree's home. Second, the evidence fails to establish that she intended to inflict bodily harm on Commeree.

We already quoted RCW 9A.28.020(1), Washington's attempt statute. To repeat, conduct amounts to a substantial step if it is "strongly corroborative of the defendant's criminal purpose." *State v. Wilson*, 158 Wn. App. 305, 317 (2010). Any act done in

22

furtherance of the crime constitutes an attempt if it clearly shows the design of the

defendant to commit the crime. *State v. Wilson*, 158 Wn. App. 305, 317 (2010).

RCW 9A.40.020(1), the first degree kidnapping statute, declares:

A person is guilty of kidnapping in the first degree if he or she intentionally abducts another person with intent:
(a) To hold him or her for ransom or reward, or as a shield or hostage; or
(b) To facilitate commission of any felony or flight thereafter; or
(c) To inflict bodily injury on him or her; or
(d) To inflict extreme mental distress on him, her, or a third person; or
(e) To interfere with the performance of any governmental function.

The State charged Kallee Knudson with attempted kidnapping in violation of

RCW 9A.40.020(1)(c). Thus, the State held the burden of proving Knudson intended to

restrain Janie Commeree and to inflict bodily injury on Commeree.

Kallee Knudson relies on *State v. Grundy*, 76 Wn. App. 335, 886 P.2d 208 (1994).

An undercover police officer working as a drug runner approached Jeffrey Grundy and

asked him what he wanted. Grundy asked to buy cocaine and stated that he had the

money to pay. The officer asked to see the money, but Grundy said he wanted to see the

cocaine first. The officer placed Grundy under arrest without having seen the money.

The State charged and convicted Grundy of attempted possession of cocaine. On appeal,

Grundy argued that insufficient evidence established that he engaged in overt conduct

that constituted a substantial step toward possessing cocaine. Since Grundy did not

approach the officer seeking to purchase cocaine and only asked for cocaine in response

23

to the officer asking what Grundy wanted, this court agreed insufficient evidence

supported Grundy's conviction. This court offered the following explanation:

> Although his words evidenced an intent to acquire possession of cocaine, they are insufficient, without more, to constitute the requisite overt act.
> The overt act must be more than preparation; it must be "'a direct, ineffectual act done toward commission of a crime and, where the design of a person to commit a crime is clearly shown, slight acts done in furtherance of this design will constitute an attempt.'" [*State v.*] *Roby*, 67 Wn. App. [741] 746-47, 840 P.2d 218 [1992] (quoting [*State v.*] *Nicholson*, 77 Wn.2d [415,] 420, 463 P.2d 633 [(1969]). In *Roby*, we found when Mr. Roby produced a $100 bill for $50 worth of cocaine, that was a sufficient overt act to support finding an attempt to possess a controlled substance. Here, the evidence did not show a sufficient step for us to find an overt act leading directly toward consummation of the attempted crime. The parties were still in the negotiation stage.

*State v. Grundy*, 76 Wn. App. 335, 337-38 (1994).

*State v. Gundy* aids the State, not Kallee Knudson. Jeffrey Grundy took no

affirmative steps on his own. Unsimilarly, Knudson asked Thomas Sluman and Cameron

Nelson to restrain Janie Commeree with zip ties or duct tape. Knudson traveled to

Commeree's residence believing Sluman, at her request, had bound Commeree. Knudson

entered the home with the intent of force ingesting Commeree with pills, the effects of

which would have further restrained Commeree. Knudson had journeyed well beyond

the negotiation stage of the crime.

RCW 9A.04.110(4)(a) defines bodily injury as "physical pain or injury, illness, or

an impairment of physical condition." We already concluded, for purposes of an assault,

24

that Kallee Knudson sought to inflict great bodily harm or injury, a higher degree of harm

than bodily injury. For the same reasons that Knudson sought to impose great bodily

harm on Janie Commeree, we conclude that Knudson sought to inflict bodily injury.

*Criminal Solicitation*

Kallee Knudson argues that insufficient evidence supports her two convictions for

criminal solicitation of Cameron Nelson. She does not challenge the criminal solicitation

convictions for her conduct with Thomas Sluman. The jury convicted her of soliciting

Nelson to commit assault and to commit kidnapping. She asserts that she never, during

either of their meetings, gave Nelson specific details for how to commit the crimes nor

showed him the items she intended for him to use to execute the crimes. Knudson also

asserts that she did not offer Nelson payment to assist in committing the crimes.

Under RCW 9A.28.030(1),

> A person is guilty of criminal solicitation when, with intent to
> promote or facilitate the commission of a crime, he or she offers to give or
> gives money or other thing of value to another to engage in specific
> conduct which would constitute such crime or which would establish
> complicity of such other person in its commission or attempted commission
> had such crime been attempted or committed.

In short, the crime "punishes the act of engaging another to commit a crime." *State v.*

*Jensen*, 164 Wn.2d 943, 950, 195 P.3d 512 (2008).

Solicitation is an attempt to persuade another to commit a specific offense. *State*

*v. Jensen*, 164 Wn.2d 943, 951-52 (2008). The crime involves no more than asking

someone to commit a crime in exchange for something of value. *State v. Jensen*, 164 Wn.2d 943, 952 (2008). Unlike conspiracy and attempt, it requires no overt act other than the offer itself. *State v. Jensen*, 164 Wn.2d 943, 952 (2008). When a person offers to give money or some other thing of value to another to commit a crime, the solicitation has occurred regardless of the completion of the criminal act. *State v. Varnell*, 162 Wn.2d 165, 169, 170 P.3d 24 (2007). If the solicitant agrees, the solicitor incurs criminal liability for conspiracy, and if the solicitant attempts to commit or accomplishes the crime, the solicitor is liable as an accomplice. *State v. Jensen*, 164 Wn.2d 943, 952 (2008).

Kallee Knudson called Cameron Nelson and requested that he meet her because she wished him to perform a job. She did not specify the type of job while the two spoke on the phone. Knudson and Nelson's first meeting lasted ten minutes. During this meeting, Knudson reiterated that she had a job for Nelson and handed him a paper containing Janie Commeree's name and the date of Commeree's birthday. Knudson requested that Nelson meet with Thomas Sluman.

The next day, Cameron Nelson and Thomas Sluman traveled to Kallee Knudson's home. When they arrived, Knudson informed them that Janie Commeree called CPS on her and she needed possession of Commeree's cell phone. Knudson stated that the two men should break into Commeree's home, use zip ties to restrain Commeree, sedate her, and pilfer her phone. In exchange for their assistance in consummating her plan,

Knudson offered Nelson and Sluman money. She added that she would care for them financially and supply them with an alibi. Knudson informed Nelson that, because she worked for law enforcement, she was a "good person to know" and could remove a red-flag from his digital police file if he agreed to assist her. RP at 990. Knudson later removed the "red flag" from Nelson's file. When the meeting at Knudson's home concluded, Knudson drove Nelson and Sluman to Commeree's residence. Once in front of Commeree's home, Knudson told Nelson and Sluman she wanted them to carry out her plan that night.

In short, the evidence established that Kallee Knudson relayed to Cameron Nelson key details of her plan to assault and kidnap Janie Commeree. She also offered renumeration and the removal of a red flag from Nelson's law enforcement record. When viewing the evidence in the light most favorable to the State, a jury could conclude beyond a reasonable doubt that Knudson offered Nelson an unknown amount of money and what she perceived to be a "thing of value" to engage in conduct that would constitute first degree assault and first degree kidnapping.

*Possession of a Controlled Substance with the Intent to Deliver*

Kallee Knudson next argues that insufficient evidence supports her conviction for possession of a controlled substance with intent to deliver. She argues that the State failed to establish she intended to deliver Oxycodone to Janie Commeree and she highlights that she legally possessed the Oxycodone pills. Knudson also asserts that,

27

despite several discussions with Sluman about the potential impact of Oxycodone on Commeree, she and Sluman, during the last conversation, planned to sedate Commeree with heroin, not Oxycodone. She maintains that she and Sluman did not discuss the use of Oxycodone on or near the date of her arrest.

RCW 69.50.401 provides, in relevant part:

> (1) Except as authorized by this chapter, it is unlawful for any person to manufacture, deliver, or possess with intent to manufacture or deliver, a controlled substance.
> (2) Any person who violates this section with respect to:
> (a) A controlled substance classified in Schedule I or II which is a narcotic drug or flunitrazepam, including its salts, isomers, and salts of isomers, classified in Schedule IV, is guilty of a class B felony and upon conviction may be imprisoned for not more than ten years, or (i) fined not more than twenty-five thousand dollars if the crime involved less than two kilograms of the drug, or both such imprisonment and fine; or (ii) if the crime involved two or more kilograms of the drug, then fined not more than one hundred thousand dollars for the first two kilograms and not more than fifty dollars for each gram in excess of two kilograms, or both such imprisonment and fine.

Kallee Knudson correctly observes that the evidence established she and Thomas Sluman agreed to sedate Janie Commeree using heroin. But the agreement to use one controlled substance does not rule out use of another substance. The evidence also established that she intended to sedate Commeree using opioids and that she ferried nine Oxycodone pills into Commeree's home. Toting nine pills into Commeree's residence served no purpose other than to deliver them to Commeree in a forceful fashion. Knudson cites no law that excuses her from the crime because she possesses a

28

prescription, if she intends to deliver the medication to another person. A jury could conclude beyond a reasonable doubt that Knudson carried the nine Oxycodone pills into Commeree's residence with the intent to deliver them to Commeree.

*First Degree Theft*

Kallee Knudson argues that insufficient evidence supports the jury's finding that she acted as Thomas Sluman's accomplice to the January 25 theft of Janie Commeree's phone because the evidence presented at trial did not establish that she knew, prompted, solicited, commanded, encouraged, or requested that Sluman act on his own to steal Commeree's phone. RCW 9A.56.030, Washington's first degree theft statute, provides the relevant language:

> (1) Except as provided in RCW 9A.56.400, a person is guilty of theft in the first degree if he or she commits theft of:
> . . . .
> (b) Property of any value, other than a firearm as defined in RCW 9.41.010 or a motor vehicle, taken from the person of another.

Under RCW 9A.08.020(3),

> A person is an accomplice of another person in the commission of a crime if:
> (a) With knowledge that it will promote or facilitate the commission of the crime, he or she:
> (i) Solicits, commands, encourages, or requests such other person to commit it; or
> (ii) Aids or agrees to aid such other person in planning or committing it; or
> (b) His or her conduct is expressly declared by law to establish his or her complicity.

Kallee Knudson did not specifically direct the unidentified person's theft of Janie Commeree's cell phone. The evidence established, however, that Knudson solicited Thomas Sluman to assist her in executing a plan that Knudson created to gain possession of Commeree's cell phone. Knudson requested that Sluman enter Commeree's home, restrain Commeree, and inject her with heroin so that Knudson could take Commeree's phone and send text messages from the phone. Knudson paid Sluman a total of $1,500 to assist in implementing that plan. Sluman understood the ultimate goal of Knudson's plan to be Knudson's possession of Commeree's phone. Sluman hired a third party to accomplish that goal and to satisfy Knudson.

Kallee Knudson's encouragement and funding led to the theft of Janie Commeree's cell phone. She encouraged and intended that goal. The State presented sufficient evidence to convict Knudson of accomplice liability to the theft of the cell phone.

## Ineffective Assistance of Counsel

Kallee Knudson argues that she was denied her constitutional right to the effective assistance of counsel because defense counsel did not move to suppress or limit the scope of the cell phone search warrant and did not request a separate and distinct acts jury instruction. After outlining principles applied to ineffective assistance of counsel claims, we separately review the two tasks that Knudson claims trial counsel should have performed.

30

The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee the right to effective assistance of counsel. *State v. Estes*, 188 Wn.2d 450, 457, 395 P.3d 1045 (2017). Washington courts employ the two-part test adopted by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984) to analyze claims of ineffective assistance of counsel. *State v. Estes*, 188 Wn.2d 450, 457 (2017). Under *Strickland*, the defendant must show both (1) deficient performance and (2) resulting prejudice to prevail on an ineffective assistance claim. *State v. Estes*, 188 Wn.2d 450, 457-58 (2017).

Proving deficient performance requires showing that counsel performed below an objective standard of reasonableness based on consideration of all the circumstances. *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009). Proving prejudice requires showing that counsel's errors deprived the defendant of a fair trial whose result is unreliable. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

*Search Warrant*

Kallee Knudson argues that the cell phone search warrant was overly broad and defense counsel performed deficiently by failing to move to limit its scope or suppress it. She asserts prejudice from this failure because the search warrant permitted an entire extraction of her cell phone. The State responds that Knudson cannot show she was prejudiced by defense counsel's failure to move for suppression of her cell phone records because the most compelling evidence against her came from the phone of Thomas

31

Sluman, who provided law enforcement with access to his phone records. We agree with the State. To conserve ink, we analyze only the prejudice element of ineffective assistance of counsel.

As the State emphasizes, Thomas Sluman cooperated with law enforcement by supplying police his cell phone records, which included the text messages to and from Kallee Knudson. Those records convicted Knudson. The State had access to the texts through Sluman's phone such that the outcome of the trial would have likely been the same.

### *Jury Instructions*

Kallee Knudson next asserts that the trial court's jury instructions allowed the jury to use the same act to convict her on the solicitation, attempt, possession with intent to deliver, and theft charges. She argues that defense counsel performed deficiently by failing to request a separate and distinct acts jury instruction that would preclude the jury from employing the same act to convict him of more than one crime. In turn, according to Knudson, defense counsel's deficient performance violated her right to be free from double jeopardy because she faced multiple punishments for the same offense.

The State claims that the trial court addressed and resolved the potential problem of multiple punishment for one action during sentencing. During sentencing, the trial court ruled that some of the crimes constituted similar crimes such that the court did not include them in sentencing. The State faults Knudson for claiming error in the

instructional phase of the trial and failing to analyze the sentencing record. The State

asks us to decline to review this claim of error based on this fault.

Kallee Knudson relies on *State v. Mutch*, 171 Wn.2d 646, 254 P.3d 803 (2011) as

support for her argument. In *State v. Mutch*, the State charged Richard Mutch with five

counts of second degree rape. The to-convict jury instructions for each of the five counts

were nearly identical in that "'they all indicated the same time of occurrence of the

criminal conduct, between the 2nd day of February, 1994 and the 3rd day of February,

1994.'" *State v. Mutch*, 171 Wn.2d 646, 662 (2011) (internal citation omitted). None of

the instructions expressly stated that the jury must find that each charged count represents

an act distinct from all other charged counts. The Washington State Supreme Court

determined that the jury instructions failed to inform the members of the jury that each

crime required proof of a different act. Nevertheless, the Supreme Court explained that

flawed jury instructions that permit a jury to convict a defendant of multiple counts based

on a single act do not necessarily mean that the defendant received multiple punishments

for the same offense. The omission only means that the defendant potentially received

multiple punishments for the same offense. The Supreme Court concluded that a double

jeopardy violation did not follow from the jury instructions because there were no

multiple punishments for the same action.

*State v. Mutch* supports the State's argument, not Kallee Knudson's position. The

Supreme Court decision directs courts to focus on the scope of the punishment, not the

No. 38799-2-III
*State v. Knudson*

number of convictions, when resolving double jeopardy claims. Knudson fails to analyze her punishments.

Regardless, unlike in *State v. Mutch* wherein the State charged Richard Mutch with five identical counts of second degree rape based on criminal conduct occurring at the same time and between the same dates, the State charged Kallee Knudson with two counts of attempt, four counts of criminal solicitation, one count of possession of a controlled substance with intent to deliver, and one count of first degree theft. The to-convict instructions for each of those eight charges were not identical because their key elements differ.

To show no error in the failure to seek a distinct acts jury instruction, we present a chart.

| Crime | Date of Criminal Conduct | Other People Named in the Instruction | Instruction # & Record Citation |
|---|---|---|---|
| Attempted Assault in the First Degree | On or about February 5, 2019 | N/A | Instruction 21 CP 1332 |
| Attempted Kidnapping in the First Degree | On or about February 5, 2019 | N/A | Instruction 25 CP 1336 |
| Criminal Solicitation to Commit Attempted Kidnapping in the First Degree | On or between January 18, 2019 and February 5, 2019 | Thomas Sluman | Instruction 29 CP 1340 |
| Criminal Solicitation to Commit Assault in the First Degree | On or between January 18, 2019 and February 5, 2019 | Thomas Sluman | Instruction 27 CP 1338 |
| Criminal Solicitation to Commit Attempted Kidnapping in the First Degree | On or between January 18, 2019 and February 5, 2019 | Cameron Nelson | Instruction 30 CP 1341 |
| Criminal Solicitation to Commit Assault in the First Degree | On or between January 18, 2019 and February 5, 2019 | Cameron Nelson | Instruction 28 CP 1339 |

34

| Possession with intent to deliver a Controlled Substance | On or about February 5, 2019 | N/A | Instruction 35 CP 1346 |
|---|---|---|---|
| Theft in the First Degree | On or about January 25, 2019 | N/A | Instruction 55 CP 1366 |

Legal Financial Obligations

Kallee Knudson argues that the superior court improperly imposed discretionary legal financial obligations on her despite her indigency. The State does not respond other than to defer to this court's resolution of the assignment of error.

This court reviews a trial court's decision on whether to impose legal financial obligations for an abuse of discretion. *State v. Clark*, 191 Wn. App. 369, 372, 362 P.3d 309 (2015). The trial court abuses its discretion when the exercise of its discretion is manifestly unreasonable or based on untenable grounds or reasons. *State v. Powell*, 126 Wn.2d 244, 258, 893 P.2d 615 (1995).

Under RCW 10.01.160(3):

> The court shall not order a defendant to pay costs if the defendant at the time of sentencing is indigent. In determining the amount and method of payment of costs for defendants who are not indigent, the court shall take account of the financial resources of the defendant and the nature of the burden that payment of costs will impose. For the purposes of this section, a defendant is "indigent" if the defendant: (a) Meets the criteria defined in RCW 10.101.010(3) (a) through (c); (b) is homeless or mentally ill as defined in RCW 71.24.025; (c) has household income above 125 percent of the federal poverty guidelines and has recurring basic living costs, as defined in RCW 10.101.010, that render the defendant without the financial ability to pay; or (d) has other compelling circumstances that exist that demonstrate an inability to pay.

35

RCW 36.18.020(2)(h) declares that on conviction:

> an adult defendant in a criminal case shall be liable for a fee of two hundred dollars, except this fee shall not be imposed on a defendant who is indigent as defined in RCW 10.01.160(3).

When completing Kallee Knudson's judgment and sentence, the sentencing court did not check any box to indicate a finding of indigency for Knudson. In its oral ruling, the trial court waived the crime laboratory fee because of indigency, but the court imposed that fee on Knudson in the judgment and sentence. At the conclusion of the sentencing hearing, Knudson filed a motion for an order of indigency to authorize expenditure of public funds for an appeal. Five days later, the superior court granted the motion and signed an order reflecting that decision. Because the record of the sentencing hearing and the appeal order reflect that the superior court found Knudson to be indigent at the time of sentencing, we conclude that the court improperly imposed discretionary financial obligations on Knudson, an indigent defendant.

## Statement of Additional Grounds

In Kallee Knudson's statement of additional grounds, she argues that her counsel misspelled her last name throughout the appellant's brief, referred to her when citing a portion from the report of proceedings instead of referring to Thomas Sluman, and incorrectly asked this court to dismiss her conspiracy charges when she was never convicted of conspiracy charges. She requests that this court correct the spelling of her

last name, change the relevant reference from her name to Sluman's name, and dismiss the solicitation charges against her.

We have spelled Kallee Knudson's name correctly throughout this opinion. We accurately employ the names of testifying individuals. Knudson's counsel did not, in the appellant's brief, argue that this court should dismiss conspiracy charges. In this opinion, we analyzed whether this court should dismiss the solicitation charges involving Cameron Nelson.

CONCLUSION

We affirm Kallee Knudson's convictions. We remand to the superior court to remove discretionary legal financial obligations from the judgment and sentence.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Fearing, C.J.

WE CONCUR:

_____
Staab, J.

_____
Cooney, J.